REVISED - 9/5/00

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40348

_____

ANTONIO BARRIENTES

                    Petitioner - Appellee-Cross-Appellant

        v.

GARY L JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION

                    Respondent - Appellant-Cross-Appellee

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

August 7, 2000

Before KING, Chief Judge, and SMITH and STEWART, Circuit Judges.

KING, Chief Judge:

    In this habeas case, the district court granted relief on
six claims related to the penalty phase of Petitioner Antonio
Barrientes's capital murder trial and vacated Barrientes's death
sentence.  The court denied all other claims and an application
for a certificate of probable cause.  Respondent Gary L. Johnson,
Director, Texas Department of Criminal Justice, Institutional
Division, appeals from that portion of the district court's order
granting relief, and Petitioner applies for a certificate of

probable cause to appeal ten claims upon which relief was denied. With regard to the Director's appeal, we reverse the district court as to one claim, vacate that portion of the district court's order granting relief on the remaining five claims, and remand for an evidentiary hearing. Treating Petitioner's application for a certificate of probable cause as an application for a certificate of appealability, we deny his application.

## I. FACTUAL BACKGROUND

In 1985, Petitioner Antonio Barrientes and a co-defendant, David Gonzales, were convicted of the capital murder of Jose Arredondo, who, while working as a clerk at the Fina-Jamco convenience store in Brownsville, Texas, was shot in the head four times. Arredondo was found in the cooler of the store by a relative of the store's owner.

Felix Sanchez, who had known Barrientes for twenty-five years, testified during the guilt/innocence phase of the trial that he walked into the store on the afternoon of the murder to purchase gas. He did not see a clerk, so he banged his hand on the counter. Barrientes popped up from behind the counter and Sanchez asked him when he had started working there. Barrientes responded, "Be quiet. I'm in the middle of a robbery." Sanchez told Barrientes that he wanted no part of it, turned, and began walking toward the door. He heard Barrientes say that he,

2

Barrientes, had to "shoot the son-of-a-bitch." As Sanchez was opening the front door, he saw Barrientes pushing a dark-haired individual from the stockroom into the cooler; he then heard two shots.

Sanchez got in his car and began to drive away. Remembering that his gas gauge was on empty, he made a U-turn and drove to another gas station across the street from the Fina-Jamco store. While there, he noticed a few people enter and leave the Fina-Jamco store. He then noticed Barrientes leaving with a cardboard box and watched him until he disappeared into an alley next to the store. Sanchez got in his car and began driving home. On his way, he saw Barrientes get into the passenger seat of Gonzales's car. Gonzales was at the wheel.

Sanchez testified that he returned to his mother's house, where he was living at the time, and that he saw Gonzales's car in the alley behind the house. Barrientes and Gonzales were in a neighbor's yard watching Sanchez until the neighbor called them away. Sanchez then left to take his mother to an appointment at a hospital in Galveston, an eight or nine hour drive from Brownsville. Along the way, he told his mother what he had seen, and she convinced him to tell the police. Later that night, he flagged down a highway patrolman and gave a videotaped statement at a police station about five hours from Brownsville. He gave another statement several weeks later.

On cross-examination, Barrientes's counsel and Gonzales's counsel attacked discrepancies between Sanchez's earlier statements and his testimony. Sanchez explained that he had been tired, confused, and nervous during his previous statements. Gonzales's counsel also attacked Sanchez's unwillingness to speak with the defense prior to the trial.

Two other witnesses testified that they went into the Fina-Jamco store on the afternoon of the murder and that Barrientes was working behind the counter, did not know how to operate the cash register, and appeared under the influence of drugs. Another State witness, David Meza, testified that while in county jail on a DWI charge, Barrientes confessed the murder to him on two separate occasions. The prosecutor elicited testimony that because of overcrowding Meza was on a floor of the jail reserved for murderers. On cross-examination, Barrientes's counsel inquired how the confession was brought to the attention of authorities, and Meza responded that he had only repeated the story to a friend of his, a man whom Barrientes had once shot in the leg.

The defense presented only two witnesses. The first was an employee from the county jail who testified that Meza's booking card showed that he was assigned to a floor separate from the floor where suspected murderers were housed. On cross-examination, the witness admitted that, due to overcrowding, Meza could have been switched to a different floor from that noted on

4

his booking card, and that his booking card might not have been changed to reflect the switch.

The second witness was Barrientes. He admitted to being in the Fina-Jamco store on the day of the murder, but explained that he had gone there to buy beer and had discovered Felix Sanchez in the store holding a cardboard box with beer, cigarettes, and a money bag in it. Sanchez left and Barrientes stayed behind at Sanchez's request to open the cash register and steal money from it. While attempting to do this, two customers came in and he waited on them.

During the penalty phase of the trial, several police officers testified in summary fashion that the defendants' reputations in the community for being peaceful and law-abiding citizens were bad. Two witnesses, including an investigator for the district attorney's office, Joe Garza, testified that during the trial, Barrientes threatened to "take care" of Felix Sanchez. Garza further testified that he had arrested Barrientes for capital murder in 1979, that the case was still pending, and that a witness in the case had disappeared (the "1979 Unadjudicated Murder").[1]

---

[1] The prosecution also presented evidence that Gonzales had been convicted of three prior felonies, two of which were for possession of marijuana. Barrientes's counsel, Mr. Davidson, had, while working in the prosecutor's office many years before, prosecuted Gonzales on one of the marijuana charges. Davidson testified on behalf of Gonzales during the penalty phase of this trial that the marijuana charge would now be considered a misdemeanor. Other than Davidson, no witness testified for

5

During closing, the prosecutor commented on the 1979

Unadjudicated Murder as follows:

>    Well, you heard Mr. Garza get up and testify that he
> arrested Barrientes back in '79 for another capital murder
> but that the witness disappeared in that.  I'll leave that
> to your thoughts.  Another capital murder in 1979.

>    Here we are again with another capital murder.  What's
> next?  A witness disappeared.  I wonder where the witness
> is.  I wonder.  He knows.  He knows where the witness is as
> he sits there right now.  He knows.  He knows.

>    . . . .

>    . . . You tell me what justice is.  We've got one
> capital murder in 1979 where the witness disappeared.

>    God knows where the witness is in that case.  He may be
> in a cooler somewhere, although not in a store.  He may be
> somewhere where no one would ever find him.

State Record Vol. IX, at 41.  The prosecutor continued during

surrebuttal:

>    Mr. Davidson talked to you about the only witness [to
> the 1979 Unadjudicated Murder], that I'd like you to believe
> he's dead and buried.  Since he brought it up he probably is
> dead and buried.  Probably is.

>    Innuendo?  He was arrested for capital murder and the
> witness is gone.  I'm not going to yell and scream about
> that.  You believe what you want to about that.  That's up
> to you.  You saw what he's done.  You saw what he did to Joe
> Arredondo.

>    What's he going to do to Felix Sanchez?  What's he
> going to do to Felix Sanchez, the one who identified him?
> He was so high on heroin that he didn't know enough to go
> ahead and kill Felix Sanchez.

>    Thank God he was high on heroin, otherwise Sanchez
> would probably be dead now.  He would be another witness
> that would be dead, and then I guess at that point the State

---

either defendant at the penalty phase.

6

would have some more innuendo, as Mr. Davidson says, because we'd not have the witness.

Id. at 53. After the penalty phase concluded, Barrientes was sentenced to death and Gonzales was sentenced to life in prison.

## II. PROCEDURAL BACKGROUND

Barrientes appealed from his conviction, and the Texas Court of Criminal Appeals affirmed. See Barrientes v. State, 752 S.W.2d 524 (Tex. Crim. App. 1987). His subsequent petition for writ of certiorari was denied by the United States Supreme Court. See Barrientes v. Texas, 487 U.S. 1241 (1988).

Barrientes filed a state post-conviction petition for a writ of habeas corpus in August 1988 (the "First State Petition"). The petition raised a multitude of claims, including prosecutorial misconduct, ineffective assistance of counsel, insufficient evidence at the penalty phase of the trial, improper jury consideration of facts not presented at trial, and various attacks on the Texas capital sentencing statute. The Court of Criminal Appeals stayed his execution and ordered an evidentiary hearing on the ineffective assistance of counsel claims. The evidentiary hearing was held before the same state district judge who had presided at Barrientes's capital murder trial. After entering findings of fact and conclusions of law, the state district court recommended denial of relief. In early 1989, the Texas Court of Criminal Appeals denied relief on all grounds,

7

with two judges dissenting.  See Ex parte Barrientes, No. 19,007-01, order at 2 (Tex. Ct. Crim. App. Feb. 1, 1989).

On March 8, 1989, Barrientes filed his first federal petition for habeas corpus in the United States District Court for the Southern District of Texas.  The claims raised in this petition were substantially the same as the claims raised in his First State Petition.  The petition was amended in April 1992 (the "Amended First Federal Petition"), based upon evidence obtained by Barrientes's habeas counsel.  The Amended First Federal Petition contained additional factual allegations regarding the 1979 Unadjudicated Murder, allegations that Meza's testimony was coerced, and allegations that Sanchez's mother and wife would have, if called to testify, contradicted his testimony.  Attached to the petition were an affidavit from Sanchez's mother and copies of the contents of the Cameron County Sheriff's Office's file on the 1979 Unadjudicated Murder (the "Sheriff's File" or the "File").

Because the Sheriff's File sits at the center of the principal dispute in this case, a description of its salient inculpatory and exculpatory contents is warranted.[2]  The File

_____

[2] We provide that description, however, with several caveats.  First, Barrientes provides no affidavit authenticating the photocopied documents appended to his petition.  We therefore have no assurance that these documents are what Barrientes claims them to be or that they represent the entire contents of the File.  For purposes of this opinion, however, we nonetheless refer to this collection of documents as the File.  Second, there are numerous documents in the File that are either wholly or

8

contains evidence that on April 6, 1979, just outside the city of Brownsville, Ronnie Vance was found dead in the backseat of a purple Honda Civic belonging to Jack Fields.  He was found with one gunshot wound and one shotgun wound to the face and head. Jack Fields rented part of his residence to a man named Castro Bob.  Castro Bob had been allowing Vance to stay there for free. Fields reported that a significant sum of cash and a .357 Magnum Smith and Wesson handgun were missing from his property.

The File contains an affidavit of Investigator George Gavito, who reported that on April 11 he received a call from and then met with a man named Larry Rowin.  Rowin told Gavito that he was picked up by Vance and a man named Emilio Gonzales ("Big-E") on April 5 and that Vance explained to Rowin that he, Vance, was going to purchase forty pounds of marijuana.  Vance showed Rowin a large wad of cash and a handgun.  Big-E was carrying a shotgun, which he explained was a prop to convince police or the border patrol that the men were hunting should they be pulled over.  The three men drove to a river levee, and Vance told Rowin to wait there.  Rowin waited, and about ten minutes later he heard a shotgun blast and then a car driving off.  He got scared and ran. Rowin believed that Big-E murdered Vance and that the murder was set up in advance.  Gavito's affidavit also states that Rowin

_____

partially illegible.  These include handwritten notes and what appear to be photocopied photographs.  The description we provide is simply our best read of what's before us.  We do not intend this description to be treated as controlling on remand.

"left town in a hurry after the news of the arrest of Emilio Gonzales [Big-E], Jesus Flores and Tony Barrientes came out." A lookout bulletin was run for law enforcement agencies describing Rowin as a material witness in a capital murder, and a grand jury subpoena was sworn out for Rowin. A copy of both the lookout bulletin and the grand jury subpoena are included in the File.[3]

The File also contains an affidavit of Investigator Garza dated April 12. The affidavit indicates that a reliable, confidential informant reported that Barrientes told the informant that Vance met with Barrientes, Flores, and Big-E that night at the levee to purchase a controlled substance, and that in the course of the sale one of the three shot Vance with a small handgun and then with a shotgun.

Also included in the File is the affidavit of Barrientes himself dated April 14, 1979. Barrientes avers that Vance spent several days looking for forty pounds of marijuana to purchase. Vance was to ship the marijuana to a dealer in Houston, but he was looking for a good price so that he could mark the marijuana up before moving it along. A number of people, including Barrientes, Big-E, and Vance spent most of the day for several days hanging out at the home of Jesus Flores ("Chucho"). During that time, Big-E picked a fight with several people, including Vance. During the arguments, Big-E made it clear that he was

---

[3] Barrientes argues that Rowin is the witness the prosecutor in the Arredondo murder trial claimed was murdered by Barrientes.

carrying a firearm.  On April 5, the day Vance was murdered, Vance spent most of the day at Chucho's house but left about 5:00 PM with Castro Bob.  Vance showed back up at Chucho's house alone at about 7:00 PM driving a purple Honda.  Vance showed Barrientes over $2,000 in cash and a .357 Magnum.  Barrientes told Vance that Barrientes's dealer could not deliver the forty pounds of marijuana until 11:00 PM.  Vance was worried that he could not get the marijuana on the last bus bound for Houston, so he asked Big-E if he could get forty pounds immediately.  Big-E responded that he could, and he and Vance left.  Barrientes never saw Vance again, and he learned from reading the Sunday paper that Vance had been murdered.

The File also contains records indicating that Barrientes, Big-E, and Flores were arrested and held without bond. Additionally, a copy of the Cameron County Prisoner's Jail Record on Barrientes is included.  In his petition, Barrientes alleges that this record indicates that he was eventually released without any bond having to be posted.  The quality of the copy before us is too poor to confirm his allegation.  The File also contains a warrant issued on April 13 to search Big-E's home for a .357 Magnum.  Also included in the File is a polygraph report indicating that on April 25, Barrientes passed a polygraph examination and that he "emphatically denie[d] any knowledge of/and or participation in the shooting of Ronald Roger Vance." The report also states, "[f]or Case Details, see Polygraph

11

Subject #1, Emilio Gonzalez."  No other polygraph reports are included in the File.

Finally, appended to the Amended First Federal Petition was an affidavit of Anthony P. Calisi, the prosecutor in Barrientes's capital murder trial, stating that, at the time of Barrientes's trial, he was unaware of the existence of any information regarding the 1979 Unadjudicated Murder that was exculpatory in nature.  The affidavit further states that if Barrientes was not involved in the 1979 Unadjudicated Murder, and if the State, at the time of Barrientes's capital murder trial, was aware of Barrientes's lack of involvement, "then [Calisi's] inclusion and reference [in closing argument] to the culpability of Mr. Barrientes for the 1979 murder was improper."  Affidavit of Anthony P. Calisi, subscribed and sworn on Feb. 14, 1992, at 2. Calisi stated that, "[a]lthough [he could not] state with any certainty whether omitting such argument would have changed the jury verdict, [he felt] confident the inclusion of such argument seriously impacted the jury and it's [sic] decision."  Id.

Because the Amended First Federal Petition contained additional information that had never been presented to the state courts, Respondent Gary L. Johnson, Director, Texas Department of Criminal Justice, Institutional Division (the "State"), moved to dismiss the petition for failure to exhaust state remedies. Based on the evidence presented in the petition, and without the benefit of an evidentiary hearing, the district court was "of the

opinion that no writ of habeas corpus for release from confinement should [have] issue[d] for Mr. Barrientes but that his sentence of death should [have] be[en] vacated." Barrientes v. Collins, No. B-89-044, order at 1 (S.D. Tex. Aug. 23, 1995) [hereinafter "1995 Order"]. Nonetheless, the district court granted the State's motion and dismissed the petition without prejudice for failure to exhaust state remedies. It also entered findings of fact and conclusions of law in support of its opinion, for the state courts' benefit and its own, "should this matter not be disposed of at the State level." Id. In November of 1995, the district court denied Barrientes's Application for Certificate of Probable Cause, as did we in an unpublished opinion. See Barrientes v. Johnson, No. 95-40880 (5th Cir. Aug. 20, 1996) (unpublished).

Barrientes returned to state court and filed a second state post-conviction writ (the "Second State Petition"), which was, in all relevant respects, identical to his Amended First Federal Petition. His Second State Petition was dismissed as an abuse of the writ. Then, in November 1997, Barrientes filed a second federal petition (the "Second Federal Petition"), which was, in all relevant respects, identical to his Amended First Federal Petition and his Second State Petition. The State answered and moved for summary judgment alleging, inter alia, that claims asserted by Barrientes relying on evidence and factual allegations not presented in his First State Petition were

13

procedurally barred.  The district court entered a brief order on February 27, 1998 (the "1998 Order") that adopted the findings of fact and conclusions of law detailed in its 1995 Order and stated an additional ground for relief.  The court consequently vacated Barrientes's death sentence and denied a writ of habeas corpus for release from confinement.

The State filed a motion to reconsider the 1998 Order, and Barrientes filed a motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure.  Both motions were denied.  The State timely appeals the court's 1998 Order and its denial of the motion to reconsider.  Barrientes applied for a certificate of probable cause ("CPC") in the district court to appeal certain claims on which habeas relief was denied, which application the district court treated as an application for a certificate of appealability ("COA") under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act") and denied.  He now applies for a CPC in this court.

### III.  THE STATE'S APPEAL

#### A.  Standard of Review

In reviewing a grant of habeas relief, we examine factual findings for clear error and issues of law de novo.  See Bledsue v. Johnson, 188 F.3d 250, 254 (5th Cir. 1999).  When examining mixed questions of law and fact, we also utilize a de novo

14

standard by independently applying the law to the facts found by the district court, as long as the district court's factual determinations are not clearly erroneous.  See id.

## B.  Does AEDPA Apply?

The first question we must address is whether AEDPA applies to Barrientes's Second Federal Petition.  Barrientes argues that AEDPA does not apply to his petition and attempts to distinguish this case from Graham v. Johnson, 168 F.3d 762 (5th Cir. 1999), cert. denied, 120 S. Ct. 1830 (2000).

In Graham, the petitioner's third federal habeas petition, which was filed before the effective date of AEDPA, was dismissed for failure to exhaust state remedies.  The petitioner's fourth federal habeas petition, which was filed after the effective date of AEDPA, was, we decided, governed by AEDPA.  See id. at 788.  Because Graham's first federal habeas petition was adjudicated on the merits, his fourth petition was "second or successive" within the meaning of the Act, 28 U.S.C. § 2244(b).  See id. at 773-74.

Barrientes argues that his case is distinguishable from Graham.  One purpose of AEDPA, Barrientes asserts, was to curb abuse of the federal writ, and such abuse does not exist in his case where the petition at issue does not follow another federal petition that was adjudicated on the merits.  The petition at issue in Graham was potentially abusive.  Therefore, his argument

concludes, the rule adopted in <u>Graham</u> should not apply to this case, and Barrientes's Second Federal Petition should be treated as a continuation of his dismissed Amended First Federal Petition, making it subject to pre-AEDPA rules.

This argument is unpersuasive. We read <u>Graham</u> as holding that a federal habeas corpus petition filed after the effective date of AEDPA is governed by the Act where the petitioner's previous federal petition was filed before the effective date of AEDPA and was dismissed without prejudice for failure to exhaust state remedies. <u>See</u> <u>id.</u> at 788. Whether the petition at issue will be considered "second or successive" within the meaning of the Act is immaterial to the analysis. Barrientes's Second Federal Petition is subject to AEDPA; however, it is not a "second or successive" petition within the meaning of the Act. <u>See</u> <u>Slack v. McDaniel</u>, 120 S. Ct. 1595, 1605 (2000) (holding that under pre-AEDPA law "[a] petition filed after a mixed petition has been dismissed . . . before the district court adjudicated any claims is . . . not a second or successive petition" and declining to "suggest the definition of second or successive would be different under AEDPA"); <u>In re Gasery</u>, 116 F.3d 1051, 1052 (5th Cir. 1997) ("[A] habeas petition refiled after dismissal without prejudice . . . is merely a continuation of [petitioner's] first collateral attack, not a 'second or successive' petition within the meaning of § 2244(b).").

16

### C. Claims Upon Which Relief Was Granted

Barrientes raises numerous claims in his Second Federal Petition. His petition, however, does not clearly stake out the precise constitutional violations he claims warrant the grant of a writ of habeas corpus, and we have further difficulty discerning the exact claims on which the district court granted relief in its 1998 Order and 1995 Order. As we read Barrientes's various petitions and the two orders of the district court, relief was granted upon six claims. For clarity, we detail these claims and the district court's rulings on those claims, as we understand them. As discussed more fully later in this Part, the State argues that the claims upon which relief was granted are procedurally barred, that one of these claims is barred by the doctrine of <u>Teague v. Lane</u>, 489 U.S. 288 (1989), and, alternatively, that the district court abused its discretion by failing to conduct an evidentiary hearing. The State does not address the merits of the claims upon which the district court granted relief. We are not called upon and do not express any opinion on the merits of these claims.[4]

---

[4] Finally, it appears the district court read none of the claims in Barrientes's various habeas petitions as being predicated upon some variation of an assertion that evidence of an arrest, without more, is insufficiently probative of guilt of an unadjudicated crime to be introduced at the penalty phase of a capital murder trial. His claims related to the admission of evidence of unadjudicated crimes seem to assume that evidence of

17

## 1.  Prosecutorial misconduct claims

Barrientes alleges a number of constitutional violations under the heading of "Prosecutorial Misconduct."  Second Fed. Petition at 27.  The district court granted relief on the following three claims:

## a.  Failure of the prosecution to turn over exculpatory evidence (the "Brady Claim")

Barrientes claims that the prosecutor failed to turn over the information contained in the Sheriff's File in violation of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, information that could have been used to impeach Garza's testimony at the sentencing hearing.  Among other things, he avers that evidence in the File indicates that only one person committed the 1979 Unadjudicated Murder, that the investigation of the 1979 Unadjudicated Murder focused on a different individual, that the missing witness was believed to have fled to another city, that no evidence in the File indicates that investigators thought the missing witness had been murdered, and

---

an arrest can be probative evidence of an unadjudicated crime. Indeed, when the evidence of his arrest for the 1979 Unadjudicated Murder was introduced at trial, his counsel objected only on the basis of unfair surprise, not on the basis that the evidence was either not probative or unfairly prejudicial.  In any event, the district court did not grant relief based on such an assertion, and Barrientes does not raise this assertion in his application for a COA.  The issue is, therefore, not before us.

18

that Barrientes passed at least one polygraph examination after his arrest.  See Second Fed. Petition at 20-21.

In Strickler v. Greene, 119 S. Ct. 1936 (1999), the Supreme Court recently summarized its Brady jurisprudence.  The Court stated:

> In Brady this Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence.  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  Moreover, the rule encompasses evidence known only to police investigators and not to the prosecutor.  In order to comply with Brady, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.

Id. at 1948 (internal citations and quotation marks omitted); see also id. at 1948 n.21.

In ruling on this claim, the district court stated:

> It is the responsibility of the prosecution to disclose material evidence privy only to the prosecution [sic] to defense in order to allow the opportunity to prepare a defense.  Giglio v. United States, 405 U.S. 150, 153 (1972).  In this case, only the prosecution was aware of its intention to introduce evidence of the 1979 unadjudicated offense and the failure to give proper notice made it unlikely that the defense would be able to lodge the proper objections to its admission or to properly cross-examine Mr. Garza once it was admitted.  Thus, since the immediate goal for our purposes is to examine the effect such misconduct had, in the larger context of the entire trial, or in this case, the entire penalty phase of trial, upon Petitioner's right to due process, omitting such notice was indeed prosecutorial misconduct.

19

1995 Order at 20. We read this portion of the district court's order as a ruling that a <u>Brady</u> violation occurred.

**b. Solicitation of false or misleading testimony (the "<u>Giglio</u> Claim")**

Barrientes argues that Garza's testimony regarding the 1979 Unadjudicated Murder was false. The known solicitation of false testimony by the State may constitute a violation of due process. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 153-154 (1972). We have previously explained regarding the use of misleading evidence:

> To establish a due process violation based on the State's knowing use of false or misleading evidence, [a habeas petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false. Evidence is false if, <u>inter</u> <u>alia</u>, it is specific misleading evidence important to the prosecution's case in chief. False evidence is material only if there is any reasonable likelihood that [it] could have affected the jury's verdict.

<u>Nobles v. Johnson</u>, 127 F.3d 409, 415 (5th Cir. 1997) (internal citations and quotation marks omitted, second alteration in original).

The district court found that while the testimony given by Garza was not actually false--that Barrientes had been arrested for capital murder in 1979 and that a witness had disappeared-- "the context in which the testimony was invoked, and the argument made by the prosecutor, gave the clear implication that Mr.

20

Barrientes had committed the 1979 murder and that he also did away with the witness." 1995 Order at 21-22. Citing Giglio, 405 U.S. at 153, and United States v. Antone, 603 F.2d 566, 569 (5th Cir. 1979), the district court further found that these implications were false and that the prosecutor should be imputed with knowledge of their falsity. Relying in part on Giglio, 405 U.S. at 154, and Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985), the district court concluded that improper introduction of Garza's testimony and the prosecutor's corresponding argument rendered "the penalty phase of trial . . . fundamentally unfair, in derogation of Petitioner's constitutional rights." 1995 Order at 23. We read the district court's order as granting relief on the Giglio Claim.

### c. Improper comments during closing argument of the penalty phase (the "Donnelly Claim")

Barrientes claims that, during closing argument at the penalty phase of his trial, the prosecutor asserted that Barrientes had committed the 1979 Unadjudicated Murder and had additionally murdered a witness in that case, despite knowledge that neither allegation was true. "During the penalty phase of [the] trial, the prosecuting attorney repeatedly argued that Mr. Barrientes had committed the 1979 unadjudicated murder and that Mr. Barrientes . . . also murdered [the] witness. . . . This

21

entire discourse and the prosecuting attorney's conduct amount to the use of false and prejudicial evidence . . . ." Second Fed. Petition at 32.

"In habeas corpus proceedings, we review allegedly improper prosecutorial statements made during a state trial to determine whether they 'so infected the [penalty phase of the] trial with unfairness as to make the resulting [sentence] a denial of due process.'" Ables v. Scott, 73 F.3d 591, 592 n.2 (5th Cir. 1996) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The statements must render the trial fundamentally unfair. "A trial is fundamentally unfair if 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" Foy v. Donnelly, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted); see also Little v. Johnson, 162 F.3d 855, 861 n.7 (5th Cir. 1998); Nichols v. Scott, 69 F.3d 1255, 1278 (5th Cir. 1995). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. . . . Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotation marks and internal citations omitted).

In its 1995 Order, the district court stated that "the argument made by the prosecutor . . . gave the clear implication that Mr. Barrientes committed the 1979 murder and that he also

22

did away with the witness.  If [the prosecutor] knew or should have known that this implication was false, the introduction of the evidence and argument is prosecutorial misconduct."  1995 Order at 22-23.  We understand the district court's order as concluding that the prosecutor should be imputed with knowledge of the falsity of his statements and further concluding that the argument rendered the penalty phase of the trial unfair.  See id. at 23-24.

**2.  Ineffective assistance of counsel (the "Strickland Claims")**

Barrientes further alleges that he was denied the effective assistance of counsel.  The district court granted relief on the following two claims: that Barrientes's trial counsel was ineffective for failing to request a recess after evidence of the 1979 Unadjudicated Murder was introduced and that his appellate counsel, who was the same person who represented Barrientes at trial, was ineffective for failing to raise as error on direct appeal the fact that evidence of the 1979 Unadjudicated Murder was admitted over the objection of surprise.

Claims of ineffective assistance of counsel are evaluated under the familiar standard first enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  Under that standard, a habeas petitioner must "demonstrate both that counsel's performance was deficient and that the deficiency

23

prejudiced the defense." Crane v. Johnson, 178 F.3d 309, 312

(5th Cir. 1999).

> To establish the first prong of deficient performance,
> [a habeas petitioner] must show that his trial counsel made
> errors so serious that counsel was not functioning as the
> counsel guaranteed ... by the Sixth Amendment. However,
> this Court must be highly deferential of counsel's
> performance and must make every effort to eliminate the
> distorting effects of hindsight. Therefore, we must indulge
> a strong presumption that counsel's conduct falls within the
> wide range of reasonable professional assistance. We will
> not find ineffective assistance of counsel merely because we
> disagree with counsel's trial strategy.
>
> For the second prong, [the petitioner] must show a
> reasonable probability that the result of the proceedings
> would have been different but for counsel's unprofessional
> errors. A reasonable probability is a probability
> sufficient to undermine confidence in the outcome.

Id. (internal citations and quotation marks omitted). "[I]n

cases involving mere 'attorney error,' we require the defendant

to demonstrate that the errors 'actually had an adverse effect on

the defense.'" Roe v. Flores-Ortega, 120 S. Ct. 1029, 1037

(2000) (quoting Strickland, 466 U.S. at 693).

The district court stated in regard to the first of

Barrientes's two claims that:

> Petitioner alleges that [trial counsel] failed to
> effectively block the admission of Mr. Barrientes [sic] 1979
> arrest for capital murder. As a result of the prosecution's
> failure to notice defense counsel of his intent to offer
> these facts into evidence, defense counsel was surprised by
> the attempt to introduce such evidence and, consequently,
> unprepared to make the proper objections. [Defense counsel]
> did properly object to the admission of the evidence on the
> basis of surprise but upon, having been overruled,
> thereafter failed to move for a recess in order to
> investigate the 1979 arrest. It appears from the record
> that this failure was indeed prejudicial. Since this
> allegation is related to the admission of evidence of the

24

> 1979 unadjudicated capital murder the effect of this failure in counsel performance will be discussed inclusively in the section below.

1995 Order at 14-15.  Later in its order, the court concluded that "[t]he added failure of defense counsel to move for a recess in order to investigate the proposed introduction, despite Mr. Barrientes's repeated insistence on his having been exonerated of this offense, removed any final relief for Mr. Barrientes."  <u>Id.</u> at 21.  The district court stated with regard to Barrientes's second claim that "Petitioner is correct that the admission of [evidence of the 1979 Unadjudicated Murder] over the objection of surprise gave defense counsel a basis for appeal. . . .  Defense counsel's assistance was ineffective for failing to allege this error on appeal."  <u>Id.</u> at 22.  We read the district court's statements as granting relief on the ineffective assistance claims discussed.

### 3.  The admission of evidence of unadjudicated crimes ("Preliminary Showing Claim")

Barrientes makes several claims regarding the admission of evidence of unadjudicated crimes.  The district court granted relief on one of these claims.  In his petition, Barrientes argued that "[t]he admission of evidence of unadjudicated crimes, without evidence that a crime had been committed[,] . . . was

admitted during the penalty phase of Mr. Barrientes' capital trial and, accordingly, [his] sentence of death violates the Eighth and Fourteenth Amendments to the United States Constitution."  Second Fed. Petition at 54.

The district court read this statement as a claim that, before evidence of an unadjudicated crime can be admitted in the sentencing phase of a trial, the prosecution must make a preliminary showing to the court that a reasonable jury could find the defendant committed the unadjudicated crime by a certain standard of proof.  In its 1998 Order, the district court stated:

> The issue before this Court is whether a certain standard of proof is required before any evidence of an unadjudicated offense should be admitted at the sentencing phase of a capital murder trial in order to prove that a person might be a future danger to society.  In <u>Turner v. Johnson</u>, 106 F.3d 1178, 1189 (5th Cir. 1997), the Fifth Circuit recognizes that a jury may here [sic] evidence of an unadjudicated offense if the trial court concludes that a reasonable jury could find that the accused committed the offense by a preponderance of the evidence.  <u>Huddleston v. United States</u>, 485 U.S. 681 (1988).  In the Petitioner's case, such a preliminary showing was not made and the evidence was admitted even though Defense Counsel objected to its introduction.  This Court remains of the opinion that the admissibility of such evidence contributed to the Petitioner's death sentence and the proceedings at the penalty phase of the trial did not meet the required procedural protections guaranteed by the U.S. Constitution.

<u>Barrientes v. Johnson</u>, No. B-89-044, order at 4 (S.D. Tex. Feb. 27, 1998) [hereinafter "1998 Order"].  While we have serious reservations whether this legal conclusion addresses a claim raised by Barrientes, we assume <u>arquendo</u> that it addresses the claim quoted above.

#### 4.  Materiality, error, and prejudice

In Chapman v. California, the Supreme Court held that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."  386 U.S. 18, 22 (1967).  In Brecht v. Abrahamson, 507 U.S. 619 (1993), the Court addressed the issue of harmless error in the context of collateral review.  The Court explained that "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness.  Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation."  Id. at 633-34 (internal citations and quotation marks omitted) (alteration in original).  Accordingly, the Court determined that "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  Id. at 637.  This standard requires a court to determine "whether the error had substantial and injurious effect or influence in determining the jury's verdict."  Id. (quotation marks omitted).

Of course, harmless error analysis applies to errors commonly referred to as "trial errors."  In <u>Brecht</u>, the Supreme Court distinguished between errors of this type and "structural defects."

> Trial error occur[s] during the presentation of the case to the jury, and is amenable to harmless-error analysis because it may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].  At the other end of the spectrum of constitutional errors lie structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards.  The existence of such defects--deprivation of the right to counsel, for example--requires automatic reversal of the conviction because they infect the entire trial process.

<u>Id.</u> at 629-30 (internal citations and quotation marks omitted) (alterations in original).

In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court explained that <u>Brecht</u> harmless error analysis is unnecessary when the inquiry for a particular habeas claim requires application of the more demanding "reasonable probability" standard.  <u>See</u> <u>id.</u> at 435-36.  This standard requires the petitioner to demonstrate a reasonable probability that, but for the error, "the result of the proceeding would have been different".  <u>Strickler</u>, 119 S. Ct. at 1948.  Both <u>Brady</u> claims and <u>Strickland</u> claims utilize the more demanding "reasonable probability" standard.  <u>See</u> <u>id.</u> (<u>Brady</u> claim); <u>Crane</u>, 178 F.3d at 312 (<u>Strickland</u> claim).  Moreover, in this circuit, the "reasonable probability" standard is built into the determination of whether improper prosecutor comments

28

rendered the trial fundamentally unfair.  See Foy, 959 F.2d at 1317.

In adjudicating a claim involving the use of false testimony, the "any reasonable likelihood" standard has been applied to determine materiality.  See Giglio, 405 U.S. at 153-54.  Under that standard, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" Id. at 154 (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959)).  This standard is considered less demanding on a defendant than either the "reasonable probability" or Brecht harmless-error standards.  See generally Strickler, 119 S. Ct. at 1956-58 (Souter, J., concurring) (discussing the standards).

We have never specifically addressed whether, when addressing a claim utilizing the "any reasonable likelihood" standard of materiality in the habeas context, we must additionally apply the more-demanding Brecht harmless-error standard if we find the petitioner presents a valid claim.  After considering the interests of finality and state sovereignty supporting the Supreme Court's decision in Brecht, see 507 U.S. at 635-37, and weighing those interests against the Court's recognition that "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it

29

did not substantially influence the jury's verdict," id. at 638 n.9, we assume, without deciding, that it is appropriate to conduct a Brecht harmless-error analysis in such a circumstance. See Gilday v. Callahan, 59 F.3d 257, 268 (1st Cir. 1995) (applying Brecht harmless-error to a claim of knowing use of perjured testimony).

Finally, with regard to the Preliminary Showing Claim, the district court did not specifically apply a harmless error analysis. It simply stated that "the admissibility of [the unadjudicated crime] evidence contributed to the Petitioner's death sentence and the proceedings at the penalty phase of the trial did not meet the required procedural protections guaranteed by the U.S. Constitution." 1998 Order at 4. Because the district court chose not to apply the Brecht harmless-error analysis to this claim, we assume for purposes of this opinion that it concluded that the error was of the "structural defect" type that does not require harmless-error analysis.[5]

Consequently, every claim upon which the district court granted relief, save for the Preliminary Showing Claim, required some sort of showing of materiality, prejudice, or harmful error. At the root of each of these determinations was the Sheriff's File and its contents. For the Brady Claim, there was an implicit conclusion that, based upon the contents of the File,

---

[5] We take no position on whether such a conclusion was warranted.

30

there was a reasonable probability that, had the File been disclosed to the defense, the result of the proceeding would have been different.  For the Giglio Claim, the district court concluded, based upon the contents of the File, that Garza's testimony was false or misleading and there was a reasonable likelihood that his testimony could have affected the jury's verdict.[6]  For the Donnelly Claim, the district court concluded, based upon the contents of the File, that the prosecutor's comments were improper, and the comments rendered the penalty phase of the trial fundamentally unfair.  Finally, regarding the Strickland Claims, there was an implicit conclusion that, based upon the contents of the File, there is a reasonable probability that the outcome of the penalty phase would have been different had counsel not performed deficiently.  The resolution of all five of these claims was therefore dependent upon the contents of the Sheriff's File.

### D.   The State's Arguments

The State makes three arguments on appeal.  First, it argues that the district court erred by granting relief on procedurally barred claims.  Second, it argues that the district court's ruling in its 1998 Order granting relief on the Preliminary Showing Claim relied on a rule of law that was not presented to

---

[6] We assume that the district court additionally determined that the error was not harmless under Brecht.

the state courts and whose retroactive application is barred by Teague v. Lane, 489 U.S. 288 (1989). Finally, it argues alternatively that the district court erred by failing to grant an evidentiary hearing.

In the sections that follow, we determine, first, that the Texas Court of Criminal Appeals's dismissal of Barrientes's Second State Petition constituted an independent and adequate state ground barring consideration of affected claims absent a showing of cause and actual prejudice. Next, we decide that of the claims upon which relief was granted, all but the Preliminary Showing Claim are affected by the issue of procedural bar.

Because the Preliminary Showing Claim is not affected by the potential procedural bar, we need not determine whether Barrientes has established cause and prejudice to overcome his default if the Preliminary Showing Claim independently supports the relief granted by the district court. We determine, however, that the rule announced by the district court in granting relief on the Preliminary Showing Claim is Teague-barred, and that that relief therefore cannot independently support the district court's ruling.

Consequently, we must ascertain whether Barrientes has established cause and actual prejudice to overcome his default. We conclude that a hearing in the district court is necessary to determine whether Barrientes has established cause and actual prejudice.

32

Accordingly, we reverse that portion of the district court's 1998 Order granting relief on the Preliminary Showing Claim and vacate those portions of the district court's 1998 and 1995 Orders granting relief on the other five claims, and we remand the case for a determination of cause and prejudice. Finally, we determine that the district court should have granted an evidentiary hearing on the merits of the claims affected by the Sheriff's File and that such a hearing is not barred by 28 U.S.C. § 2254(e)(2). We therefore instruct the district court to conduct an evidentiary hearing on the merits of the affected claims, should it find that Barrientes has established cause and prejudice to overcome his procedural default.

We turn now to the specifics.

### 1. Procedural Bar

A federal court cannot consider a petitioner's constitutional claim in a habeas proceeding if the state court rejected that claim on an adequate and independent state ground, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Martin v. Maxey, 98 F.3d 844, 847 (5th Cir. 1996). The state must "clearly and

33

expressly" rely on the adequate and independent state ground. Coleman, 501 U.S. at 735.  We now turn our attention to the question of adequacy[7] and address the State's argument that the dismissal of Barrientes's Second State Petition as an abuse of the writ is an adequate and independent state ground that procedurally bars consideration of certain claims in a federal habeas proceeding.[8]

### a.  Texas's abuse-of-the-writ doctrine

Barrientes's Second State Petition was dismissed as an abuse of the writ under Texas Code of Criminal Procedure article 11.071 § 5.[9]  We have previously held that Texas's abuse-of-the-writ

---

[7] It is undisputed by the parties that the Texas Court of Criminal Appeals, in dismissing Barrientes's Second State Petition, clearly and expressly relied on a rationale independent of federal law.

[8] As we read the State's brief and certain of its filings in the district court, it also argues that certain of Barrientes's claims remain unexhausted because the Texas Court of Criminal Appeals dismissed his Second State Petition rather than addressing it on the merits.  This argument has no merit.  It has long been accepted that when a state court disposes of unexhausted claims on purely procedural grounds, those claims become exhausted.  See Gray v. Netherland, 518 U.S. 152, 161 (1996) ("[The exhaustion requirement] is satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." (internal quotation marks omitted, citation omitted, and last two alterations in original)); Coleman, 501 U.S. at 732 ("A habeas petitioner who has defaulted on his federal claims in state court meets the technical requirements for exhaustion . . . ."); Engle v. Isaac, 456 U.S. 107, 125-26 n.28 (1982) (same).

[9] The statute provides, in pertinent part:

34

Notwithstanding any other provision of this chapter, this article establishes the procedures for an application for a writ of habeas corpus in which the applicant seeks relief from a judgment imposing a penalty of death.

. . . .

Sec. 5.
(a)  If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
      (1)  the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
      (2)  by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt;  or
      (3)  by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071 or 37.0711.

. . . .

(d)  For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.
(e)  For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date.

doctrine has, since 1994, provided an adequate state ground for the purpose of imposing a procedural bar.[10]  See Emery v. Johnson, 139 F.3d 191, 195-96 (5th Cir. 1997).  In Emery, we stated:

> An abuse of the writ can qualify as a procedural bar. A procedural bar is not adequate, however, unless it is applied strictly or regularly to the vast majority of similar claims.  Historically, Texas courts have failed to apply the abuse-of-the-writ doctrine in a strict or regular manner, and, therefore, we have refused to honor it.

---

TEX. CODE CRIM. P. ANN. art. 11.071 (West Supp. 2000).

[10] We discuss our precedent dealing with Texas's judicially created abuse-of-the-writ doctrine, even though the Texas Court of Criminal Appeals dismissed Barrientes's Second State Petition under article 11.071.  In Nobles v. Johnson, we declined to decide whether article 11.071 is a codification of the abuse-of-the-writ doctrine.  See 127 F.3d 409, 423 n. 32 (5th Cir. 1997). We stated:

> We note that in his concurring opinion in Davis, Judge McCormick, joined by Judges White, Meyers, and Keller, expressed the opinion that "[t]he successive writ provisions of Article 11.071, Section 5(a), for the most part are merely a legislative codification of the judicially created 'abuse of the writ' doctrine." Ex parte Davis, 947 S.W.2d at 226 (McCormick, J., concurring).  In view of the dearth of judicial interpretation of Article 11.071 § 5(a), however, we cannot definitively say, and therefore do not venture to guess, whether that section was intended to codify the preexisting abuse-of-writ doctrine.  We provide an alternate basis for finding procedural default, then, assuming that the abuse-of-writ doctrine is still viable in light of Article 11.071 § 5(a).

Id.  Since our opinion in Nobles, the Texas Court of Criminal Appeals has clarified that, "[a]lthough Presiding Judge McCormick's opinion [in Davis] is labeled a concurring opinion, it was joined by a majority of the Court and may be regarded as an opinion for the Court." Ex parte Smith, 977 S.W.2d 610, 611 n.4 (Tex. Ct. Crim. App. 1998).  We treat article 11.071 as a codification of the Texas abuse-of-the-writ doctrine.

36

This changed in 1994, when the Texas Court of Criminal Appeals announced the adoption of a strict abuse-of-the-writ doctrine, tempered only by an exception for cause. <u>See</u> <u>Ex parte Barber</u>, 879 S.W.2d 889, 891 n.1 (Tex. Crim. App. 1994) (en banc) (plurality opinion). <u>Barber</u> represents an adequate procedural bar for purposes of federal habeas review.

<u>Id.</u> (most citations and all internal quotation marks omitted).

### b. Controlling date

Barrientes argues that the Texas abuse-of-the-writ doctrine should not bar his claims despite the fact that his Second State Petition was dismissed as an abuse of the writ after 1994. He argues that in determining the adequacy of the abuse-of-the-writ doctrine in this case, we should look to the date on which his First State Petition was filed (in 1988) because that is the point at which he defaulted. He relies on <u>Fields v. Calderon</u>, 125 F.3d 757 (9th Cir. 1997), in which the Court of Appeals for the Ninth Circuit adopted a rule that adequacy should be determined at the point "when the defaulted claims should have been raised." <u>Id.</u> at 760. In that case, much like the instant case, the court was faced with a state procedural rule that existed throughout the proceedings at issue but was not, at the time the petitioner failed to raise the claims in question, applied "strictly or regularly to the vast majority of similar

37

claims." The rule, however, was so applied at the time the state court decided that the claims at issue were defaulted.[11]

Barrientes's reliance on Fields is misplaced because the cases in this circuit have reached the opposite conclusion, foreclosing his argument. Barrientes argues that our holding in Lowe v. Scott, 48 F.3d 873 (5th Cir. 1995), is in accord with the Fields rule and that it must be adhered to despite the opposite result reached in subsequent cases. See In the Matter of Dyke, 943 F.2d 1435, 1442 (5th Cir. 1991). Barrientes stretches Lowe beyond its natural reading. It is true, as Barrientes points out, that the final state habeas petition in Lowe was filed in 1990 before Texas's Barber decision, but it was also dismissed as an abuse of the writ before Barber was decided. See Lowe, 48 F.3d at 874-75. Our decision that the Texas abuse-of-the-writ doctrine was inadequate in Lowe's case, therefore, does not necessitate the conclusion that we determined adequacy as of the date Lowe took action creating the default, that is, as of the date he filed his first state petition that failed to include all of the claims raised in his federal petition.

---

[11] The Court of Appeals for the Tenth Circuit, relying on Fields, has recently adopted the same rule. See Walker v. Attorney General, 167 F.3d 1339, 1344-45 (10th Cir. 1999). Unlike the situation in the instant case or in Fields, however, the Tenth Circuit gave some indication in Walker that the rule at issue did not exist at the time the defendant failed to comply with it. See id. at 1345.

Cases decided after <u>Lowe</u>, however, necessitate the conclusion that we determine adequacy as of the date that the Texas court dismissed, or would dismiss, the claims at issue as an abuse of the writ.  In <u>Fearance v. Scott</u>, we found ourselves barred from considering a claim raised for the first time in a state habeas petition filed in 1995, which the state rejected as an abuse of the writ because it had not been included in petitioner's previous state habeas petition filed in 1992.  <u>See</u> 56 F.3d 633, 642 (5th Cir. 1995).  We determined adequacy as of the date his claims were dismissed, noting that at the time "the state district court dismissed an issue raised in Fearance's third petition that was not raised in his earlier petition it was no longer acting with any discretion."  <u>Id.</u>

In <u>Nobles v. Johnson</u>, Nobles filed his first state habeas petition in 1993.  <u>See</u> 127 F.3d 409, 412 (5th Cir. 1997).  We affirmed the district court's ruling that a claim first presented in Nobles's federal habeas petition was procedurally barred because it would be dismissed as an abuse of the writ if included in a future state habeas petition.  <u>See</u> <u>id.</u> at 423.  <u>Muniz v. Johnson</u>, 132 F.3d 214 (5th Cir. 1998), and <u>Little v. Johnson</u>, 162 F.3d 855 (5th Cir. 1998), are also in accord with the <u>Fearance</u> rule.[12]  Our precedent requires us, at least in the case of the

---

[12] Additionally, we read Supreme Court precedent informing this rule differently from how the Ninth Circuit does.  The Ninth Circuit placed substantial reliance on notice.  But in the Supreme Court cases cited in <u>Fields</u>, <u>NAACP v. Alabama ex rel.</u>

Texas abuse-of-the-writ doctrine, to determine adequacy as of the date the Texas court determines that a claim is procedurally defaulted.

The Texas Court of Criminal Appeals dismissed Barrientes's Second State Petition in 1997, several years after Barber was decided and Texas Code of Criminal Procedure article 11.071 § 5 was passed. The dismissal constituted an independent and adequate state ground. Our task, then, is to determine whether the claims upon which the district court granted relief are procedurally barred by this dismissal.

### c. Barred claims

In our 1996 unpublished opinion denying Barrientes's application for a CPC to review the district court's dismissal of

---

Patterson, 357 U.S. 449 (1958), and Ford v. Georgia, 498 U.S. 411 (1991), unlike the instant case and Fields, the state procedural rule at issue was non-existent at the time the petitioner took the action that resulted in default. Indeed, in both cases, the rule was arguably non-existent until announced and applied to the petitioner in that case. While adequacy is concerned with notice and fairness, it is also concerned with ensuring that state courts cannot prevent federal adjudication of federal rights by applying one-time rules to particular litigants.

The Texas abuse-of-the-writ doctrine was not "unannounced" at the time Barrientes filed his First Federal Petition; it was in "existence." As we have noted, it was not strictly or regularly applied, but it did exist. See Ex parte Dora, 548 S.W.2d 392, 393-94 (Tex. Crim. App. 1977). Barrientes was on notice that future petitions might be subject to default. At the time the Texas Court of Criminal Appeals dismissed Barrientes's Second State Petition, however, the rule was strictly and regularly applied. There is therefore no concern that a one-time procedural rule is being applied in Barrientes's case.

40

his Amended First Federal Petition for failure to exhaust state remedies, we noted three areas in which the State argued that Barrientes presented new factual allegations or significantly stronger evidentiary support for certain of his claims:

> (1) Although Barrientes had presented his claim that the State improperly admitted evidence of his unadjudicated 1979 capital murder arrest at the penalty phase and improperly argued concerning this arrest to the state habeas court, Barrientes presented significantly stronger evidentiary support for this argument in his amended federal habeas petition. Specifically, Barrientes included with his amended federal habeas petition the Cameron County sheriff's office's file on the 1979 arrest, indicating that the charges against Barrientes were dropped, as well as an affidavit by the prosecutor that, had he known the exculpatory information contained in the police file, he would not have argued or presented evidence regarding the 1979 arrest at the penalty phase of Barrientes's trial.

> (2) Although Barrientes had argued to the state habeas court that David Meza's testimony was fabricated, he had not alleged before the state habeas court that Meza lied because the district attorney's office threatened him. In his federal petition, Barrientes argued that Meza testified falsely because the district attorney's office threatened him, and offered Meza's testimony to that effect.

> (3) Before the state habeas court, Barrientes had broadly asserted that his counsel was ineffective for failing to interview witnesses to obtain information with which to impeach the government's principal witness, Felix Sanchez. However, in his federal habeas petition, Barrientes specifically alleged and offered evidence that Sanchez's wife and mother would have testified in a way that would have undermined Sanchez's credibility.

Barrientes v. Johnson, No. 95-40880, at 4-5 (5th Cir. Aug. 20, 1996) (unpublished) (quoting the State's Motion to Dismiss).

We held that claims relying on the new factual allegations or significantly stronger evidentiary support were unexhausted. We explained:

41

The record demonstrates that Barrientes's amended federal habeas petition presents new factual allegations and significantly stronger evidentiary support for his legal claims than he had presented to the state habeas court. We have held that a habeas petitioner fails to exhaust state remedies when he presents additional factual allegations and evidentiary support to the federal court that was not presented to the state court. See Joyner v. King, 786 F.2d 1317, 1320 (5th Cir.) (holding that "the policies of comity and federalism underlying the exhaustion doctrine" require that "new factual allegations in support of previously asserted legal theory" be first presented to the state court), cert. denied, 479 U.S. 1010 (1986); Brown v. Estelle, 701 F.2d 494, 495-96 (5th Cir. 1983) (holding that when a claim is filed in federal court in a significantly stronger evidentiary posture than it was before the state court, it must be dismissed for failure to exhaust state remedies and remanded to the state court).

Id. at 5-6. We denied Barrientes's CPC application, and he returned to state court to exhaust the claims that relied on the new factual allegations and significantly stronger evidentiary support. Of the claims upon which relief was granted, all but the Preliminary Showing Claim rely on the significantly stronger evidentiary support Barrientes claims is provided by the Sheriff's File. The Texas Court of Criminal Appeals denied his Second State Petition as an abuse of the writ, and these claims are therefore barred, unless Barrientes can show cause and prejudice for defaulting on these claims.[13]

## 2. The non-barred Preliminary Showing Claim

---

[13] Barrientes does not rely on the "manifest injustice" exception to procedural bar.

Before proceeding to determine whether Barrientes has established cause and prejudice for his procedural default, we pause to address an issue that could pretermit that determination. We need not address the issues of cause and prejudice if the Preliminary Showing Claim, which we assumed in Part III-C-4, supra, did not rely on the contents of the Sheriff's File, is sufficient to support the relief granted by the district court. The State argues first that this ground for relief was never claimed by Barrientes, that if he claimed it now before the state court it would be dismissed as an abuse of the writ, and therefore that it is procedurally barred. See Coleman, 501 U.S. at 735 n.* ("[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[, then] . . . there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims."). Alternatively, the State argues that the rule announced by the district court is Teague-barred. As we stated in Part III-C-3, supra, we assume, despite serious reservations, that the district court's relief addressed a claim actually raised in Barrientes's petition. We therefore address the State's alternative argument and determine whether the district court's relief is Teague-barred.

43

We begin by noting that the district court misstated Fifth Circuit law. In <u>Turner</u>, we simply held that evidence of unadjudicated crimes presented at the sentencing phase of a capital murder trial need not be proved beyond a reasonable doubt. <u>See</u> <u>Turner</u>, 106 F.3d at 1189 ("Although the due process clause requires the state to prove each element of the offense charged beyond a reasonable doubt to secure a conviction, neither this court nor the Supreme Court has ever held that a similar burden exists regarding the proof of facts adduced during the sentencing phase." (footnote omitted)). Moreover, we can find no other precedent from this court or the Supreme Court that supports the proposition on which the district court's grant of relief relies. We need not determine whether the rule announced by the district court is of constitutional significance, however, because we conclude that, even if it is, its application in this case is barred by the nonretroactivity rule of <u>Teague v. Lane</u>, 489 U.S. 288 (1989).

> In determining whether a state prisoner is entitled to habeas relief, a federal court should apply <u>Teague</u> by proceeding in three steps. First, we must determine when [the defendant's] conviction and sentence became final for <u>Teague</u> purposes. Second, we must survey the legal landscape as it then existed and determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution. Third, if we determine that [the defendant] seeks the benefit of a new rule, we must consider whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle.

44

<u>Fisher v. Texas</u>, 169 F.3d 295, 305 (5th Cir. 1999) (citations and internal quotation marks omitted).  An exception exists if the rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or if it is a rule of procedure that is "implicit in the concept of ordered liberty."  <u>Teague</u>, 489 U.S. at 307 (internal quotation marks omitted).  This second exception is "reserved for watershed rules of criminal procedure."  <u>Id.</u> at 311.

"A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."  <u>Caspari v. Bohlen</u>, 510 U.S. 383, 390 (1994).  Barrientes's petition for certiorari was denied in 1988.  We easily conclude that, at that time, "reasonable jurists hearing petitioner's claim . . . 'would [not] have felt compelled by existing precedent' to rule in his favor."  <u>Graham v. Collins</u>, 506 U.S. 461, 467 (1993) (quoting <u>Saffle v. Parks</u>, 494 U.S. 484, 488 (1990)).  Finally, the rule does not fall within one of the two narrow exceptions.  The new rule announced by the district court is therefore <u>Teague</u>-barred.

### 3. Cause and prejudice

45

Having determined that the Preliminary Showing Claim is Teague-barred, we turn our attention to the question of whether cause and prejudice exist to excuse Barrientes's procedural default on the five remaining claims as to which the district court granted relief.

"[T]he resolution of 'when and how defaults in compliance with state procedural rules can preclude [federal court] consideration of a federal question is itself a federal question.'" Fairman v. Anderson, 188 F.3d 635, 641 (5th Cir. 1999) (alteration in original) (quoting Johnson v. Mississippi, 486 U.S. 578, 587 (1988)). To the extent, therefore, that the Texas Court of Criminal Appeals decided issues of cause and prejudice in dismissing Barrientes's Second State Petition, we are not bound by its decision. In considering cause and prejudice in this case, we are mindful that "[w]here a district court fails to make necessary findings, a remand for entry of such findings is the usual recourse for an appellate court; however, where all of the issues on appeal may be fairly resolved from the record presented, a remand may not be required." In the Matter of Legel, Braswell Gov't Securities Corp., 648 F.2d 321, 326 n.8 (5th Cir. Unit B 1981).

Here, the district court has never explicitly addressed the issues of cause and prejudice. In its 1998 Order, it simply stated, "[t]he court has reviewed the file of the 1979 murder case which apparently was not available at the punishment phase

46

of the trial." 1998 Order at 3. Likewise, in its 1995 Order, it stated, "[i]n addition, since the filing of his First Federal Petition, as reflected in the Amended Petition, Petitioner has recovered the Cameron County police file related to the 1979 capital murder." 1995 Order at 21. Finally, in its Order denying Petitioner's Rule 59(e) Motion, the court stated, "[f]urthermore, this Court denied the Respondent's Motion to Reconsider the 1998 Order, and obviously disagrees with the Respondent's argument that the Petitioner's claims should be 'procedurally barred . . . .'" Barrientes v. Johnson, No. B-89-044 (S.D. Tex Aug. 26, 1998) (order at 1). Our task, then, is to determine whether the issues of cause and prejudice "may be fairly resolved from the record presented" or whether remand is necessary.

## a. Cause

With regard to the issue of cause, the Supreme Court has stated that:

> the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. . . . [A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard.

Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal citations and quotation marks omitted.

47

Barrientes asserts that cause exists in this case because 1) despite diligent pursuit, habeas counsel had only four months to secure the file, which proved insufficient; 2) counsel's discovery motions were denied and attempts to elicit testimony at the state evidentiary hearing on ineffective assistance of counsel were thwarted by the state judge; and 3) counsel's efforts were frustrated by State officers and the exception to the Texas Open Records Act, Texas Government Code § 552.101, et seq., that applies to investigative records.[14]

---

[14] The Texas Open Records Act provides, in pertinent part:

(1)   . . . [I]t is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees. . . .  The provisions of this chapter shall be liberally construed to implement this policy.

(2)   This chapter shall be liberally construed in favor of granting a request for information.

TEX. GOV'T CODE ANN. § 552.001 (West 1994).  The Act further provides that "[p]ublic information is available to the public during the normal business hours of the governmental body."  Id. § 552.021(b).  Public information is defined as "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . by a governmental body . . . ."  Id. § 552.002 (West Supp. 2000).

Not all information must be made public, however. "Information is excepted from the requirements of Section 552.021 if it is information considered to be confidential by law, either constitutional, statutory, or by judicial decision."  Id. § 552.101 (West 1994).  Some investigatory information is considered confidential:

(a)   Information held by a law enforcement agency or prosecutor that deals with the detection,

We decline to hold that a four-month investigative time-

> investigation, or prosecution of crime is excepted from
> the requirements of Section 552.021 if:
>
> (1)  release of the information would interfere with
>       the detection, investigation, or prosecution of
>       crime; [or]
>
> (2)  it is information that deals with the detection,
>       investigation, or prosecution of crime only in
>       relation to an investigation that did not result
>       in conviction or deferred adjudication . . . .
>
> . . . .
>
> (b)  An internal record or notation of a law enforcement
>       agency or prosecutor that is maintained for internal
>       use in matters relating to law enforcement or
>       prosecution is excepted from the requirements of
>       Section 552.021 if:
>
> (1)  release of the internal record or notation would
>       interfere with law enforcement or prosecution;
>       [or]
>
> (2)  the internal record or notation relates to law
>       enforcement only in relation to an investigation
>       that did not result in conviction or deferred
>       adjudication . . . .

Id. § 552.108 (West Supp. 2000).

The Act is not intended, it appears, to affect Texas discovery rules. "This chapter does not affect the scope of civil discovery under the Texas Rules of Civil Procedure. . . . Exceptions from disclosure under this chapter do not create new privileges from discovery." Id. § 552.005 (West 1994). "A subpoena duces tecum or a request for discovery that is issued in compliance with a statute or a rule of civil or criminal procedure is not considered to be a request for information under this chapter." Id. § 552.0055 (West Supp. 2000).

Barrientes also cites to the predecessor of the current Open Records Act, Texas Revised Civil Statute article 6252-17a § 3(a)(8) (repealed 1993). It is questionable what information could be disclosed under this statute. See, e.g., Opinion of the Attorney General ORD-177 (Tex. Sept 12, 1977).

frame establishes cause as a matter of law.  With regard to his

second and third alleged factors constituting cause, the record

on these points is important to our disposition of this case and

warrants discussion.

Barrientes filed his First State Petition on August 16,

1988.  On August 19, 1988, he filed a Motion for Discovery in

which he sought to depose District Attorney Ben Euresti and

Garza.  The motion further requested:

> All reports, memoranda, file notes, docket sheet entries,
> diaries or diary entries, calendars, and any other written
> documents of any kind whatsoever, whether official or
> unofficial, which are in deponent's possession or under his
> control, and which refer or relate to:
>
> . . . .
>
> d.  The arrest of Antonio Barrientes, the arraignment, and
> all investigation and any legal research relating to Antonio
> Barrientes' arrest for capital murder in April of 1979.

Motion for Discovery, filed Aug. 16, 1988, Ex. B.  On September

20, 1988, he filed a Supplemental Motion for Discovery, in which

he requested, inter alia:

> 2.  The Cameron County District Attorney's legal and
> investigative files, including, but not limited to,
> correspondence, memoranda, file notes, docket sheet entries,
> diaries or diary entries, calendars, exhibits, and any other
> written documents of any kind whatsoever, whether official
> of unofficial, and which refer or relate to:
>
> > (a) the arrest of Antonio Barrientes, the arraignment,
> > and all investigation and any legal research relating
> > to Antonio Barrientes' arrest for capitol [sic] murder
> > in April, 1979.
>
> . . . .

50

3. All police, highway patrol or sheriff's files, or information, relating to the investigation and/or charging of Antonio Barrientes for each and every action listed in number 2, above, if in the possession of the Cameron County District Attorney's office . . . .

Supplemental Motion for Discovery, filed Sept. 20, 1988 at 1-2. The limited state court record before us is bereft of any indication of the disposition of these motions, but we feel safe in assuming, at this point, that they were denied.[15]

His First State Petition, which did not include the contents of the Sheriff's File, nonetheless detailed what was known at the time about the 1979 Unadjudicated Murder:

> Although not introduced at trial, post-conviction investigation has shown that when Mr. Barrientes was arrested and charged for this capital murder, he voluntarily agreed to submit to a polygraphic examination, that he submitted to two polygraphic examinations conducted by the State of Texas and, as a result of those polygraphic examinations, all charges concerning this alleged prior unadjudicated murder were dropped against him.

> . . . .

> Although the State introduced evidence of this alleged 1979 unadjudicated murder (although there was no evidence that a murder occurred), the State had full knowledge that Mr. Barrientes had taken and passed a polygraph examination concerning the alleged 1979 unadjudicated murder. The most egregious aspect of this is that the State, itself, administered that polygraph examination and the arresting

_____

[15] This assumption is supported by the state trial court's Order on Application for Writ of Habeas Corpus, entered August 19, 1988, in which the court found "that there are no controverted previously unresolved facts which are material to the legality of petitioner's confinement." The Texas Court of Criminal Appeals disagreed and ordered an evidentiary hearing regarding Barrientes's ineffective assistance of counsel claim. See Ex parte Barrientes, No. 19,007-01 (Tex. Ct. Crim. App. Aug. 24, 1988) (order remanding for evidentiary hearing).

officer, Mr. Joe Garza, who testified at the penalty phase concerning the 1979 arrest for the unadjudicated murder, was also the officer who released Mr. Barrientes from custody in 1979 when he passed the polygraph examination.

First State Petition at 10, 17-18.

At the evidentiary hearing ordered by the Texas Court of Criminal Appeals, Barrientes attempted to obtain information about the Sheriff's File. Most significant was the following exchange between Barrientes's counsel, Mr. Montoya, Garza, the Court, and counsel for the State, Mr. Cyganiewicz:

> Q. BY MR. MONTOYA [to Garza]: Did you have the file with you at the time you testified [in Barrientes's 1985 trial]?
> MR. CYGANIEWICZ: Your Honor, again, that has nothing to do with [the ineffective assistance claim].
> THE COURT: Sustained. Counsel, get to the ineffective counsel. This isn't a fishing expedition.
> Q. BY MR. MONTOYA: Did Mr. Davidson discuss with you your testimony after you had taken the stand in April, 1985?
> A. I didn't talk with Mr. Davidson, no, sir, not that I can recall. It's been so long.
> Q. Did you have your file with you at the time you testified in April of 1985?
> MR. CYGANIEWICZ: Same objection, your Honor. Whether he has a file or not with him has nothing to do with Mr. Davidson.
> THE COURT: Objection sustained.
> MR. MONTOYA: Your Honor, with all due respect --
> THE COURT: The objection was sustained.

State Record, Evidentiary Hearing Vol. I, at 136. These portions of the record indicate some effort on the part of Barrientes's habeas counsel to secure the Sheriff's File, but the picture of counsel's efforts becomes much more remarkable when the

52

affidavits of Bruce A. Montoya and Todd E. Kastetter, two of the lawyers representing Barrientes, are considered.[16]

Montoya claims that he attempted to meet with Richard Lara, an Assistant District Attorney, on May 20, 1988, while on a trip to Brownsville, but that Lara was unable to meet with him. Montoya tried to contact Lara again on July 25, 1988, but Lara would not accept his call. On July 27, Montoya sent Lara a letter stating that Kastetter would attempt to contact the District Attorney's office while in Brownsville on July 28. See Affidavit of Bruce A. Montoya, Esquire, subscribed and sworn on September 3, [year missing] at 2-3 [hereinafter "Montoya Affidavit"].

While in Brownsville on July 28, Kastetter claims to have met with Luis Saenz, an Assistant District Attorney. Kastetter requested to see all files regarding Barrientes, including

---

[16] These affidavits were appended to three documents filed by Barrientes. First, they were appended to Petitioner's Combined Motion and Brief in Support of Motion to Amend August 22, 1995 Order Granting Respondent's "Motion to Dismiss for Failure to Exhaust State Remedies" filed September 7, 1995 in the district court. Barrientes then appended them to his Supplemental Brief in Support of Application for Post-Conviction Writ of Habeas Corpus (RE: Application of Article 11.071, Sec. 5(a) Exceptions) filed in state court in support of his Second State Petition. Finally, Barrientes appended them to his Petitioner's Rule 59(e) Motion to Alter and Amend This Court's February 27, 1998 Order Granting and Denying, in Part, Petitioner's Petition for Post-Conviction Writ of Habeas Corpus (Following Dismissal Without Prejudice for Failure to Exhaust State Remedies) and Denying Respondent's Motion for Summary Judgment, filed on March 13, 1998, after the district court entered its 1998 Order ruling on his Second Federal Petition.

anything pertaining to the 1979 Unadjudicated Murder, and, after consulting with the District Attorney, Mr. Euresti, Saenz informed Kastetter that he had no right to review any of the District Attorney's files, and he would not be allowed to do so. See Affidavit of Todd E. Kastetter, Esquire, subscribed and sworn on Sept. 2, 1997 at 2.

The following day, Kastetter went to the state district court, still seeking information on the 1979 Unadjudicated Murder. He had heard that the matter had at one time been set for trial. The clerk of the court was unable to locate any files and suggested that Kastetter contact the District Attorney's office. See id. at 2-3. From there Kastetter went to meet with Barrientes's lawyer for the 1979 case, A.G. Betancourt. Betancourt remembered little about the case, and the two of them searched through Betancourt's storage area for information but came up empty-handed. See id.

At some point, Montoya and Kastetter tentatively identified the missing witness as "Castro Bob." They spent considerable time searching for him before discovering that Castro Bob was not the missing witness. See Montoya Affidavit at 4. The two then located one of the two polygraph reports and discovered the name of the justice of the peace who had sworn out the arrest warrants and determined bond issues, Judge Edward Sarabia.

Montoya met with Judge Sarabia, who originally directed Montoya to the District Attorney's office but cautioned that the

54

District Attorney would be unlikely to release any information if the case was still open. After several meetings, Judge Sarabia gave Montoya a single sheet of the docket book for the 1979 Unadjudicated Murder, indicating that Barrientes's bond had been reduced from "no bond" to $5,000 bond. See id. at 5. Judge Sarabia further suggested that Montoya search through papers in the attic of the old Cameron County Courthouse, so Montoya and Kastetter did just that for many hours, but to no avail. See id.

Next, Montoya contacted the Brownsville Police Department and the Brownsville Sheriff's Department. Both said that no records would be released without a subpoena. The Sheriff's Department suggested that Montoya contact the District Attorney's office. At some point, someone from the Sheriff's Department informed Montoya that an investigator named Alex Perez was in charge of all unsolved capital murders. Montoya tracked Perez down the next day, October 20, 1989, and Perez produced the file, but would not allow Montoya to copy it. See id. Finally, Montoya and Kastetter were allowed to copy the file.[17] See id.

---

[17] The State's argument before this court regarding the issue of cause warrants comment. In its brief, the State argues:

[There was no] evidence presented in the district court that Barrientes invoked any lawful process to obtain the file in question when he had the opportunity to do so. During the first state evidentiary hearing proceedings, Barrientes was specifically informed that there "should be" a file pertaining to the 1979 unadjudicated capital murder. However, Barrientes did not request a subpoena compelling the appearance of a custodian of records from the sheriff's office, did not seek a court order for the production of the

55

file, and did not request that Detective Joe Garza produce the file in question. The only allegation that requests were made comes from his unsupported averments that the district attorney's office and sheriff refused to cooperate with his "informal" requests. Nevertheless, Barrientes alludes to the fact that, "only by happenstance," he obtained the file when he, presumably for the first time, filed a request under the Texas Open Records Act. In short, Barrientes could have, but did not, make diligent efforts to obtain the file in state court. Barrientes was not prevented from discovering the factual basis for his claims by some objective factor external to his defense.

Respondent's Brief at 18-19 (citations and footnote omitted). The State drops a footnote stating, "In fact, the district court record is barren of any indication as to whether the file was obtained before or after the conclusion of the state habeas proceedings." Id. at 19 n.9.

First, the State, to our knowledge, has never rebutted, through affidavits or otherwise, the story as painted by Montoya and Kastetter. Assuming their affidavits to be accurate, the State's attempt to persuade us that Barrientes should have jumped through some different hoop after being told time and time again that his only recourse was through the District Attorney's office, and after being told by the District Attorney's office that he had no legal right to review any files, is, based upon the incomplete record before us, unpersuasive.

Second, the State's suggestion that Barrientes should have requested a court order to secure the File is either at odds with the record or rather puzzling. It seems obvious to us that Barrientes did just that when he filed not one, but two very specific discovery motions. If the State is suggesting that Barrientes should have gone back to the court after having these two motions denied, we can only wonder at what point the State would suggest Barrientes take "no" to mean "no." If the State intended to argue that some specific state procedure that should have been invoked by Barrientes was not, it failed adequately to develop the argument.

Finally, the State's assertion that "the district court record is barren of any indication as to whether the file was obtained before or after the conclusion of the state habeas proceeding" is an incorrect statement of the record, of which the State was, or certainly well should have been, aware. Montoya's affidavit states that he first viewed the File on October 20,

56

at 6.

The affidavits provided by Barrientes along with a review of the record indicate that he may well have cause for failing to discover the Sheriff's File before the conclusion of his first state habeas proceedings.  The allegations he makes are the sort that have led to a finding of cause in previous cases.  See Amadeo v. Zant, 486 U.S. 214, 222 (1988) (finding cause when county officials concealed evidence); Paradis v. Arave, 130 F.3d 385, 194 (9th Cir. 1997) (finding cause when prosecutor withheld

---

1989.  See Montoya Affidavit at 5.  This affidavit was appended to Petitioner's Motion to Amend the Court's Order of August 22, 1995, Dismissing the Petition for Failure to Exhaust State Remedies.  The State even responded to this motion and remarked, "Barrientes . . . contend[s] . . . that the evidence he now offered was in the state's possession at the time of the first state habeas proceeding and he should not be penalized for the state's failure to provide him with it . . . ."  Response to Petitioner's Motion to Amend the Court's Order of August 22, 1995, Dismissing the Petition for Failure to Exhaust State Remedies, filed October 3, 1995 at 2.  Assuming the State forgot about this motion and its response between 1995 and the time it filed its brief in this court, Barrientes's Second Federal Petition provided a reminder, "The Cameron County Sheriff's Department's file for the 1979 unadjudicated murder . . . was first disclosed to Petitioner's habeas counsel several months after the [first] Federal Habeas Petition was filed . . . ."  Second Fed. Petition at 18.  We could include further references to the record but find it unnecessary.

The bottom line is that whether Barrientes had access to this File during his first state habeas proceedings is a central issue in this case.  For the State to insinuate, for the first time in the second appeal in this protracted litigation, that Barrientes not only had access to the Sheriff's File during his first state habeas proceedings, but that he may have actually had the File at that time is reckless, especially considering the numerous references to when Barrientes actually got hold of the Sheriff's File contained in the record and the State's complete failure to raise this assertion earlier.

57

<u>Brady</u> evidence and quashed subpoena in first habeas proceedings); <u>Kirkpatrick v. Whitley</u>, 992 F.2d 491, 495 (5th Cir. 1993) (finding cause when evidence was suppressed and falsified coupled with state and federal laws that deterred discovery of the evidence); <u>Bliss v. Lockhart</u>, 891 F.2d 1335, 1341 (8th Cir. 1990) (noting that "prosecutorial interference with disclosure of the full evidence may indeed constitute cause"); <u>Strickler</u>, 119 S. Ct. at 1952 (acknowledging that several factors taken together can constitute cause). Moreover, we note that at each stage of his post-conviction collateral attack on the penalty phase of his trial, he presented the evidence available to him, discussed the evidence he hoped to uncover through discovery, and argued the claims he felt were appropriate based upon the available evidence and factual assertions. His counsel, it would appear, diligently pursued the Sheriff's File out of court and moved to discover the File in court, which motions were denied by the state courts.

At the beginning of our examination of cause and prejudice we noted that the district court has never addressed these issues. We stated that our task was to determine whether cause and prejudice "may be fairly resolved from the record presented." <u>See</u> <u>supra</u>. We determine that the issue of cause cannot be adequately resolved on the record before us. The affidavits supplied by Barrientes, while compelling, have never been answered by the State. We find it necessary to remand this case to the district court with instructions to conduct an evidentiary

58

hearing on the issue of cause.[18]  We, of course, do not instruct
the district court on what decision it should make on the issue
of cause.

### b.  Prejudice

To overcome a procedural default, a habeas petitioner must
demonstrate "actual prejudice as a result of the alleged
constitutional violations."  Coleman, 501 U.S. at 745.  Prejudice
can be examined at both the guilt/innocence and penalty phases of
a capital murder trial.  See Strickler, 119 S. Ct. at 1955; id.
at 1956 (Souter, J., concurring in part and dissenting in part)
("As the Court says, however, the prejudice enquiry does not stop
at the conviction but goes to each step of the sentencing process
. . . .").  The Supreme Court has been reluctant to define the
precise contours of the prejudice requirement.  See Amadeo, 486
U.S. at 221.  However, the Strickler Court recently explained
that in the context of establishing cause and prejudice for
procedurally defaulting on a Brady claim, a petitioner must
convince the court that:

---

[18] See Jenkins v. Anderson, 447 U.S. 231, 234-35 n.1 (1980)
("[A]pplication of the 'cause'-and-'prejudice' standard may turn
on factual findings that should be made by a district court.");
Barnard v. Collins, 13 F.3d 871, 878 (5th Cir. 1994) ("[T]he
district court's determination that [petitioner's] claim
constituted an abuse of the writ because he could not show 'cause
and prejudice' for his failure to raise this claim in his earlier
petition seems premature in the absence of an evidentiary hearing
or other appropriate proceeding . . . .").

> there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense. . . .  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

119 S. Ct. at 1952 (internal citations and quotation marks omitted).  The Court explained that the prejudice inquiry in the situation presented in Strickler mirrored the materiality prong of the underlying Brady claim.  See id. at 1949 ("In this case, cause and prejudice parallel two of the three components of the alleged Brady violation itself.").  In Williams v. Taylor, however, the Supreme Court stated, when addressing the issue of prejudice for procedural default, "[q]uestions regarding the standard for determining the prejudice that petitioner must establish to obtain relief on these claims can be addressed by the [lower courts] in the course of further proceedings."  120 S. Ct. 1479, 1494 (2000).  This statement implies that the "reasonable probability" standard may not guide the prejudice inquiry in the case of every defaulted habeas claim.  We leave to the district court the task of establishing for each claim the proper standard to guide the determination of actual prejudice, should Barrientes establish cause for his default.

### 4.  A hearing on the merits

60

Finally, we must address two related arguments advanced by the State.  First, the State argues at several points in its brief that the district court erred in making findings of fact related to the Sheriff's File without conducting an evidentiary hearing.  The State then argues that even if Barrientes can establish cause and prejudice to prevent his claims from being procedurally barred, the district court still cannot reach the merits of his claims because, as previously stated, an evidentiary hearing is required, and Barrientes cannot establish the so-called "cause and actual innocence" required by 28 U.S.C. § 2254(e)(2) before a federal habeas court is permitted to hold an evidentiary hearing.[19]  See, e.g., Nobles, 127 F.3d at 423 n.33 (discussing the cause and actual innocence standard).  We

---

[19] Section 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that
    (A)  the claim relies on
        (I)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (1997).

begin by deciding whether the district court should have conducted an evidentiary hearing in this case. Finding that it should have, we proceed to dispose of the State's § 2254(e)(2) argument.

The Rules Governing Section 2254 Cases in the United States District Courts provide guidance on the appropriateness of an evidentiary hearing in cases such as this. Rule 8(a) states:

> If the petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and the transcript and record of state court proceedings are filed, shall, upon a review of those proceedings and of the expanded record, if any, determine whether an evidentiary hearing is required. If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require.

28 U.S.C. foll. § 2254 Rule 8(a) (1994). The decision whether to conduct an evidentiary hearing is left to the sound discretion of the district court, and we review its decision for an abuse of that discretion. See McDonald v. Johnson, 139 F.3d 1056, 1059 (5th Cir. 1998). We have stated before that when "[t]he district court ha[s] sufficient facts before it to make an informed decision on the merits of [the habeas petitioner's] claim" it does not abuse its discretion in failing to conduct an evidentiary hearing. Id. at 1060.

Most often, this situation arises when the district court denies the petitioner relief without conducting an evidentiary hearing. But the rule also applies in a situation where the district court has sufficient facts before it and grants the writ

without a hearing.  See Hicks v. Wainwright, 633 F.2d 1146, 1150 (5th Cir. Unit B 1981) ("The State argues that the district court should have held an evidentiary hearing.  An evidentiary hearing is necessary only when facts are at issue.  When the only question is legal rather than factual no evidentiary hearing is needed.").  If, however, sufficient factual development has not occurred, and the district court grants the writ, we have in the past remanded the case for a hearing.  See Thomas v. Estelle, 582 F.2d 939 (5th Cir. 1978).

In this case, we agree with the State that the district court lacked sufficient undisputed facts to make an informed decision and therefore abused its discretion in failing to conduct an evidentiary hearing.  An evidentiary hearing would have provided both sides an opportunity to present evidence regarding, inter alia, whether the copies appended to Barrientes's petition are what he claims them to be and whether they are exculpatory or impeaching in nature.  Our normal course of action would be to remand this case for a hearing.  Before doing so, however, we must determine whether a hearing is precluded by § 2254(e)(2).

Section 2254(e)(2) provides that when a habeas petitioner has "failed to develop the factual basis of a claim in State court proceedings, the [federal] court shall not hold an evidentiary hearing . . . unless the applicant" establishes so-

called "cause and actual innocence."[20]  The State argues that

§ 2254(e)(2) precludes the evidentiary hearing that is needed in

this case because Barrientes cannot, at the very least, meet the

actual innocence prong of the standard established by

§2254(e)(2).  Barrientes responds that § 2254(e)(2) does not

apply to his case, because he has not "failed to develop the

factual basis of a claim in State court proceedings."

We have previously addressed the question of whether a

petitioner has "failed to develop" the factual basis of a claim

in McDonald v. Johnson, 139 F.3d 1056 (5th Cir. 1998).  In

McDonald, as in this case, the habeas petitioner was denied an

evidentiary hearing in state court.  We held that "a petitioner

cannot be said to have 'failed to develop' a factual basis for

his claim unless the undeveloped record is a result of his own

decision or omission."  Id. at 1059; see also Clark v. Johnson,

202 F.3d 760, 765 (5th Cir. 2000) (applying the McDonald

standard); Robison v. Johnson, 151 F.3d 256, 268 (5th Cir. 1998)

(same).

Any question regarding the "failed to develop" standard was

put to rest by the Supreme Court in Williams v. Taylor, 120 S.

---

[20] Section 2254(e)(2) prohibits a court from conducting a
hearing, regardless of which side requests it.  We therefore
agree with the State, as a general matter, that it can argue that
the merits of a habeas claim cannot be reached because a hearing
is needed to resolve factual issues underlying the claim, but the
district court is precluded by § 2254(e)(2) from conducting the
needed hearing.

64

Ct. 1479 (2000). There, the Court stated that "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Id. at 1488. The Supreme Court in Williams also linked the "failure to develop" inquiry with the cause inquiry for procedural default. See id. at 1494 ("Our analysis [of § 2254(e)(2)] should suffice to establish cause for any procedural default petitioner may have committed in not presenting these claims to the Virginia courts in the first instance."). In this case, if Barrientes establishes cause for overcoming his procedural default, he has certainly shown that he did not "fail to develop" the record under § 2254(e)(2). Accordingly, if the district court determines that Barrientes has established cause and prejudice for his procedural default, it should proceed to conduct an evidentiary hearing on any claim for which cause and prejudice exists. It should then revisit the merits of any such claim anew.[21]

## IV. BARRIENTES'S APPLICATION

---

[21] We note that if the district court determines that cause and prejudice exist for Barrientes's default of any claim, its findings in that regard may directly address its merits determination of certain elements of that claim. See, e.g., Strickler, 119 S. Ct. at 1949 ("In this case, cause and prejudice parallel two of the three components of the alleged Brady violation itself.").

65

Barrientes wishes to appeal ten claims that were denied by

the district court.[22]  Because he seeks to initiate an appeal

after the effective date of AEDPA, "the right to appeal is

---

[22] Barrientes's Second Federal Petition also contained the
following claims that were implicitly denied by the district
court and that are not before us because Barrientes has not
raised them in his COA application.  Barrientes alleged that the
prosecutor made improper comments during closing argument at the
penalty phase regarding the character of the victim and that he
made comments during closing argument of the guilt/innocence
phase regarding the failure of the defense to call certain
witnesses.  Barrientes also claimed that his trial counsel was
ineffective for failing to make certain objections during the
trial.

Regarding the introduction of evidence of unadjudicated
crimes, Barrientes argued that:  the introduction of such
evidence is unreliable, in violation of the Eighth Amendment;
allowing the introduction of such evidence in capital cases while
disallowing the introduction of such evidence in noncapital cases
violates the Equal Protection Clause of the Fourteenth Amendment;
and allowing the introduction of such evidence without prior
notice renders a defendant's counsel ineffective.  Barrientes
claimed that the evidence presented at the penalty phase of his
trial was insufficient to support a finding of future
dangerousness.  He also claimed that the judge's failure to allow
Barrientes's counsel to ask venire members about their
understanding of what a life sentence means under Texas law
denied Barrientes the right to an impartial jury under the Sixth
Amendment, created the risk that the death sentence might be
imposed based on mistaken notions of parole eligibility in
violation of the Eight Amendment's guarantee against cruel and
unusual punishment, and violated his right to due process.

Barrientes asserted that neither the judge's charge to the
jury following the penalty phase of trial nor the special issues
form notified the jury that their answers to the special issues
necessarily determined whether or not the death penalty would be
imposed.  Such failure created the unacceptable risk that the
jury would not understand its responsibility and violated the
Sixth, Eighth, and Fourteenth Amendments.  Finally, Barrientes
claimed that the Texas Death Penalty statute, on its face and as
applied, violates the Fifth, Sixth, Eighth, and Fourteenth
Amendments.

governed by the certificate of appealability (COA) requirements now found at 28 U.S.C. § 2253(c)." Slack, 120 S. Ct. at 1600. Barrientes has applied to this court for a CPC. We treat an application for a CPC as an application for a COA.[23] See Lucas v. Johnson, 101 F.3d 1045, 1046 (5th Cir. 1996). To obtain a COA, a prisoner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to make such a showing, a prisoner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack, 120 S. Ct. 1603-1604 (internal quotation marks omitted). In a case such as this, where the prisoner seeks to appeal the district court's merit-based denial of certain constitutional claims, the Supreme Court has explained that "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 1604.

As we have previously explained, the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d). See Hill v. Johnson, 210 F.3d 481, 484-85 (5th Cir. 2000). Under § 2254(d), when reviewing a

---

[23] We refer to his CPC application as a COA application throughout the remainder of this opinion.

67

claim adjudicated by a state court on the merits, we pay deference to the state court's decision regarding that claim, unless the decision "[is] contrary to, or involve[s] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . [is] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). A decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000). A decision "involve[s] an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court of the United States" "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Factual findings of the state court have a presumption of correctness, which presumption the petitioner can only rebut by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Barrientes raises four types of issues in his application. He argues, first, that he was denied effective assistance of

counsel; second, that his trial proceedings were plagued by prosecutorial misconduct; third, that the admission of evidence of the 1979 Unadjudicated Crime violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution; and, finally, that jury deliberations were tainted by the consideration of facts not in the record. We address each type of claim in turn.

## A. Ineffective Assistance

Barrientes raises three claims of ineffective assistance of counsel. First, he argues that counsel was ineffective for failing to investigate or interview witnesses during the guilt phase of his trial. Second, he asserts that counsel was ineffective for failing to discover and present mitigating evidence during the penalty phase of his trial. Finally, he claims that counsel was ineffective for failing to obtain complete criminal records on Barrientes and his co-defendant and request a severance. As we explained in more detail in Part III-C-2, supra, claims of ineffective assistance of counsel are evaluated under the familiar standard first enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Under that standard, a habeas petitioner must "demonstrate both that counsel's performance was deficient and that the deficiency prejudiced the defense." Crane, 178 F.3d at 312.

69

### 1. Failing to investigate at the guilt phase of the trial

Barrientes argues that his trial counsel, Mr. Davidson, was ineffective for failing to investigate or interview witnesses during the guilt phase of the trial. He asserts, first, that Davidson failed to investigate Felix Sanchez. Had he done so, he would have discovered evidence to impeach Sanchez's testimony. Barrientes provides an affidavit from Sanchez's mother that contradicts certain portions of Sanchez's testimony. He also asserts that Sanchez's wife maintains that Sanchez was threatened by the police in order to make him testify. Second, Barrientes asserts that Meza, the jailhouse informant, was also threatened to secure his testimony.[24]

The State responds that this claim is procedurally barred. As we discussed in Part III-D-1-c, supra, Barrientes, in his First State Petition, presented no evidence concerning the threats allegedly made to secure the testimony of Sanchez and Meza and the statements made by Sanchez's mother. This claim was therefore considered unexhausted when Barrientes filed his Amended First Federal Petition. Barrientes's Second State Petition, which contained the same evidence and factual allegations he offers us, was rejected by the Texas Court of

---

[24] Barrientes provides no affidavits to support the statements he alleges Meza and Sanchez's wife made to habeas counsel, and we take no position on the reliability or sufficiency of this evidence.

70

Criminal Appeals as an abuse of the writ.  In order for us to consider this claim, therefore, Barrientes must establish cause and prejudice for his procedural default.  Barrientes asserts neither cause for his procedural default nor that failure to address this issue will result in manifest injustice, but simply argues that he has not defaulted because the Texas abuse-of-the-writ doctrine did not provide an adequate and independent state ground.  Having previously resolved that issue against Barrientes, see Part III-D-1-b, supra, we will not consider this ineffective assistance of counsel issue.  Cf. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("As [petitioner] alleges no cause for his procedural default and inasmuch as failure to consider it will not result in manifest injustice, this assignment of error fails."); Meanes v. Johnson, 138 F.3d 1007, 1011 (5th Cir. 1998) ("If a petitioner fails to show cause for his procedural default, the court need not address the prejudice prong of the test.").

## 2.  Failing to discover or present mitigating evidence at the penalty phase of the trial

Barrientes's second claim of ineffective assistance centers on the failure of Davidson to discover or present mitigating

evidence at the guilt phase of the trial.[25]  In his first state

habeas proceedings, Barrientes was granted an evidentiary hearing

on his claim of ineffective assistance.  The state trial court

made findings of fact and conclusions of law, for which

conclusions it relied on the two-part Strickland inquiry, and

those findings and conclusions were adopted by the Texas Court of

Criminal Appeals.[26]  This constitutes an adjudication on the

merits for purposes of § 2254(d).  See Hill, 210 F.3d at 485.

The Texas Court of Criminal Appeals denied Barrientes relief on

this ineffective assistance claim, as did the district court.

Barrientes asserts that had Davidson properly investigated,

he would have discovered mitigating evidence to present at the

penalty phase of the trial.  This evidence, which was revealed in

large part by testimony from Barrientes's mother and former

priest at the state hearing, includes the fact that Barrientes

was married and had two children, had at one time been an altar

---

[25]  In this same section of his brief, Barrientes asserts
that Davidson failed to object to the prosecutor's comments
concerning the virtuousness of the victim and testified on behalf
of Barrientes's co-defendant.  He fails to develop any argument
that either of these actions constituted ineffective assistance
of counsel under Strickland.  We, therefore, do not consider
these claims.  See Trevino v. Johnson, 168 F.3d 173, 181 n.3 (5th
Cir. 1999).

[26] The state court judge that presided over Barrientes's
evidentiary hearing on this issue was the same judge that
presided over his capital murder trial.  The presumption of
correctness afforded the state court's determination of factual
issues is, therefore, especially strong.  See Clark v. Johnson,
202 F.3d at 764.

boy, had served in the military and had been honorably discharged, and had trouble with substance abuse and had sought professional help shortly before the murder.

The state habeas court found that Davidson would not have called Barrientes's wife or mother to testify, even had he known of the evidence listed above, because of his concern that the value of any mitigating evidence would be outweighed by the risk of damaging evidence being brought out during cross-examination of these witnesses.[27]  Moreover, the state habeas court pointed out that Barrientes's mother avoided discussing any aspect of Barrientes's life in the ten years prior to the murder.  In response to the state habeas court's findings, Barrientes simply asserts that the findings of the state habeas court are not entitled to deference because "[t]he record is clear that Mr. Davidson did not make a fully-informed strategic decision with regard to his failure to conduct any investigation in preparation of his defense of the . . . penalty phase."  Barrientes's COA Brief at 38.  The record reveals that Davidson conferred with Barrientes on numerous occasions and met with Barrientes's mother at least three times before the trial began.  Barrientes has failed to present clear and convincing evidence that the findings of the state habeas court are not entitled to a presumption of

---

[27] Barrientes's common-law wife did not testify at the state habeas hearing.  It is therefore impossible to ascertain what the content of her testimony would have been.

73

correctness.  See Hernandez v. Johnson, No. 99-10446, 2000 WL 691603, at *5 (5th Cir. May 30, 2000) (applying § 2254(e)(1) deference in the context of a COA application).

We conclude that Barrientes has not made a substantial showing of the denial of a constitutional right.  We have previously held that a tactical decision not to present character evidence during the penalty phase of a capital murder trial because it would open the door for incidents of prior misconduct was not unsound and therefore did not constitute deficient performance.  See Ward v. Whitley, 21 F.3d 1355, 1361 (5th Cir. 1994).  As long as Davidson's performance was not deficient, we need not examine, under the second prong of Strickland, whether his decision prejudiced the defense.  See Lincecum v. Collins, 958 F.2d 1271, 1278 (5th Cir. 1992).  Barrientes has failed to demonstrate that, given the findings of the state habeas court and our precedent, "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner [with regard to this claim] or that the issue[] presented w[as] adequate to deserve encouragement to proceed further."  Slack, 120 S. Ct. 1603-1604.


### 3.  Failure to request criminal records and request a severance

In his final claim of ineffective assistance of counsel, Barrientes argues that "[t]rial Counsel failed to determine the

74

criminal records of Mr. Barrientes and his co-defendant prior to and during the trial and sentencing hearing.  Had Mr. Davidson investigated Mr. Barrientes' prior criminal record, he would have discovered a statutory basis for severance of the trial from Mr. Barrientes' co-defendant."  Barrientes's COA Brief at 25. Davidson originally filed a motion for severance, but when it came up for consideration, he stated that he knew of no statutory reason for the severance.  Under Texas law, however, Barrientes claims that he was statutorily entitled to severance because his co-defendant, Gonzales, had a felony conviction, and Barrientes did not.  Barrientes argues that Davidson's failure to discover Gonzales's record and follow through with his motion for severance constituted objectively unreasonable assistance, and that he was prejudiced thereby.  At the state evidentiary hearing, however, it became evident that Davidson's failure to discover Gonzales's record was a result of his strategic decision not to pursue a severance.  The following exchange took place between Davidson and counsel for the State:

> Q.  You mentioned also that even if I knew about those convictions of David Gonzales, I would not have asked for a severance because of my trial strategy and tactic to do that; is that correct?
>
> A.  Yes.
>
> Q.  Can you just briefly explain what your thinking was that you wanted them to be tried together as your tactic?
>
> A.  Well, during that -- Between the time those motions were filed and the hearings were had on those motions,

75

Mr. Gilman [trial counsel for Gonzales] advised me that his client had told me that --

MR. KARR: Your Honor, I'm going to object to what Mr. Gilman is telling Mr. Davidson.

THE COURT: Overruled.

THE WITNESS: I wished [sic] I didn't have to testify to this, Your Honor.

Q. BY MR. CYGANIEWICZ: Okay. Well, --

A. That after Tony robbed the store, he came back to where Gonzales rode with the car and told David, "I had to kill the son of a bitch."

Q. But for some reason you decided this was a strategic move on your part? You wanted them tried together?

A. Well, at that time, David Gonzales' parents, I knew, were putting pressure on Pete Gilman in regards to Mr. Gonzales because he had tried to commit suicide a couple of times in the jail. And from what my client was telling me, that he was going to take the stand and exonerate–he didn't use that word–exonerate David Gonzales. In my own mind, my strategy was: The best way to keep him from taking the stand was to try them together.

State Record, Evidentiary Hearing Vol. I, at 86-88. The state habeas court found:

After filing the motion for severance, Davidson soon became convinced that it would not be in his client's best interest to have his case severed from that of Gonzales. If the Court had ever indicated that the severance would be granted, he would have withdrawn the motion. Davidson knew Barrientes would testify that Gonzales "had nothing to do with the entire transaction"; Barrientes "insisted on it." From Gonzales's attorney Davidson learned that if Gonzales should testify, he would testify that after Barrientes robbed the store he came back to the car and told Gonzales "I had to kill the son of a bitch." Davidson concluded that the best way to keep Gonzales off the stand was to try the Defendants together with Barrientes exonerating Gonzales. Davidson's trial strategy was based upon his conclusion that

76

Barrientes [sic] "only chance was to keep Gonzales off the stand and to convince the jury Sanchez was the trigger man." Indeed Davidson's strategy partly succeeded; Gonzales did not testify.

Findings of Fact and Conclusions of Law entered November 10, 1988, at 2. Like Barrientes's second ineffective assistance of counsel claim, this claim was adjudicated on the merits for purposes of § 2254. It is clear from the record that Davidson made a tactical decision to avoid severance, and the state habeas court so found. Barrientes is unable to rebut the presumption of correctness afforded the finding of the state habeas court. See 28 U.S.C. § 2254(e)(1).

As the Supreme Court explained in Strickland:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

466 U.S. 688-89. Barrientes makes no convincing argument that the tactical decision of his trial counsel should not be given deference. Because Davidson's decision to avoid severance falls so clearly within the range of objective reasonableness, we need not examine whether the decision prejudiced the defense within the meaning of Strickland. See Lincecum, 958 F.2d at 1278. Barrientes has consequently failed to make a substantial showing of the denial of a constitutional right. He has neither convinced us that reasonable jurists could debate whether the

77

performance of his trial counsel was objectively unreasonable in this regard nor that reasonable jurists could debate whether the state court made an objectively unreasonable application of the Strickland standard to the facts of this case.

## B. Prosecutorial Misconduct

Barrientes raises several claims under the heading of prosecutorial misconduct. We address each claim in turn.

### 1. Threats made to secure the testimony of Sanchez and Meza

Barrientes first claims that the prosecutor failed to reveal that threats and coercion were used to secure the testimony of both Sanchez and Meza. He claims that this conduct violated both Brady and Giglio. We need not reach the merits of this claim because it has been procedurally defaulted. The claim relies on the statements allegedly made to habeas counsel by Sanchez's wife and Meza. We previously determined in Part IV-A-1, supra, that claims dependant upon these factual allegations are procedurally barred, and Barrientes does not assert cause or manifest injustice to overcome the procedural bar.

### 2. Improper suggestion that the jury would not have to accept responsibility for the imposition of the death sentence

Barrientes's second claim centers around certain comments that he asserts "intimate[d] that the jury would not have to accept responsibility for imposition of the death sentence." Barrientes's COA Brief at 43. While Barrientes does not cite to any case in support of his claim, we assume that he alleges a violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985), in which the Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." <u>Id.</u> at 328-29.

Barrientes points to comments made by the prosecutor during voir dire. The prosecution asked one eventual juror, "Do you understand, sir, that you as an individual, or the jurors, collectively, you do not assess the death penalty. If anyone does that it is the judge. You understand that?"[28] State Record Vol. IV, at 132. To another eventual juror, the prosecutor stated, "You never assess the death penalty. That's up to the

---

[28] We note that the following exchange also took place between this eventual juror and the prosecutor:

Q. Did you have any questions of me, anything at all about the death penalty or anything?

A. No, sir. The Judge did a good job of getting his point across this morning.

79

Judge."[29]  State Record Vol. VI, at 778.  Barrientes argues that this conduct was aggravated by the trial court's refusal to allow the defense to discuss with members of the venire their understanding of a life sentence under Texas law.

Barrientes fails to make a substantial showing of the denial of a constitutional right.  In Montoya v. Scott, we explained that:

> [i]n Dugger v. Adams, 489 U.S. 401 (1989), the Supreme Court clarified its holding in Caldwell and held that to "establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law."  Id. at 407. In evaluating a Caldwell claim, we look to the "total trial scene," including jury selection, the guilt phase of the trial, and the sentencing hearing, examining both the court's instructions and counsel's arguments to the jury.

65 F.3d 405, 420 (5th Cir. 1995) (some citations omitted).  At the time of Barrientes's conviction, the applicable Texas statute provided, in pertinent part that "[i]f the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death." TEX. CODE CRIM.

---

[29] We note that the following exchange occurred between the prosecutor and the eventual juror shortly after the above quoted statement:

Q.   Okay.  Now, if you answer both of these [special questions during the penalty phase] yes then you leave the courtroom with the other jurors.  You go home.

A.   Okay.

Q.   Then the judge is obligated under the law to assess the death penalty.

A.   Oh, I see.

P. Aɴɴ. art. 37.071(e) (West 1981).  In <u>Montoya</u>, the judge

instructed the jury that "[i]n capital murder cases the jury does

not assess punishment. . . . Now, if you answer the two questions

yes, then the Court, the judge, is required to assess the

punishment of death to the accused."  65 F.3d at 420 n.31.  We

determined that, in making that comment, "the trial court did not

misinform the jury of its role under local law and therefore did

not violate <u>Caldwell</u>."  <u>Id.</u> at 421.  Likewise, here, the comments

by the prosecutor were accurate under local law.

Moreover, looking at the total trial scene, it is clear that

the jury was not misinformed.  Indeed, prior to jury selection

the judge informed all the venire members that:

> In an ordinary case after hearing that evidence you as
> a jury would go out and decide his punishment.  That is
> whether he's going to get ten years or twenty years or life
> in the penitentiary, depending on how you feel about the
> seriousness of the offense and the character of the
> defendant.

> In a capital murder case the jury does not decide the
> punishment, and I'll say that again: In a capital murder
> case at the end of the punishment stage the jury does not
> decide the punishment, rather, I, as the Judge, ask you two
> fact questions and you, as a jury, will either answer those
> questions yes or no.

> . . . .

> However, our law provides that you must know that if
> you answer yes to both of those questions the Judge must
> impose the death penalty upon the defendant.

> If you answer the two questions, both of them yes, then
> the Judge must assess the punishment of death.  If you
> answer either or both of the questions no then the Judge
> must assess the penalty of life in prison.

81

So while you do not assess punishment our law says you must know and understand that you answers as given will determine whether the Judge gives death or life . . . .

State Record Vol. IV, at 19-21.  Barrientes has failed to demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issue[] presented [is] adequate to deserve encouragement to proceed further."  <u>Slack</u>, 120 S. Ct. 1603-1604.


### 3. Elicitation of unsubstantiated hearsay and unsubstantiated testimony regarding threats

Because Barrientes's third and fourth claims under the heading of Prosecutorial Misconduct are related and deserve little comment, we dispose of them together.  He claims that the prosecutor improperly elicited testimony from Mr. Sanchez that he was threatened if he testified.  He also claims that the testimony of Daniel Agado, the court security officer, indicating that Barrientes had threatened Sanchez while in Agado's custody, was unreliable because Agado had testified similarly in another case.

As to the elicitation of unsubstantiated hearsay, Barrientes points to no constitutional right that was violated.  Counsel for Barrientes's co-defendant brought up threats during his cross-examination of Sanchez.  The prosecutor returned to the topic during redirect.  Counsel for the co-defendant objected, and the

82

judge overruled his objection. Barrientes's counsel objected;

the judge brought the line of questioning to an end, and the

trial moved on. We are not even convinced that the prosecutor

erred, let alone that he committed misconduct of constitutional

magnitude. We assume that the claim regarding Agado is a Giglio

claim. As we see it, no reasonable jurists could debate whether

Barrientes has proved that Agado's statement was actually false.

Any Giglio claim would, therefore, necessarily fail. See Nobles,

127 F.3d at 415. Barrientes has made no showing of a denial of a

constitutional right regarding these claims.


**4. Improper comment on Barrientes's failure to testify**

Barrientes's fifth and final claim under the heading of

prosecutorial misconduct is that the prosecutor, during closing

argument of the penalty phase, improperly commented on

Barrientes's failure to testify. The prosecutor stated:

> Let's go to the second [question]. Whether or not
> there's a probability that the defendant, Barrientes and/or
> Gonzales, would commit criminal acts of violence that would
> constitute a continuing threat to society.

> Whether or not it's probable that Barrientes and/or
> Gonzales would commit criminal acts of violence that would
> constitute a continuing threat to society.

> Well, you heard Mr. Garza get up and testify that he
> arrested Barrientes back in '79 for another capital murder
> but that witness disappeared in that. I'll leave that to
> your thoughts. Another capital murder back in 1979.

> Here we are again with another capital murder. What's
> next? A witness disappeared. I wonder where the witness

83

is.  I wonder.  <u>He knows.  He knows where the witness is as he sits there right now.  He knows.  He knows.</u>

State Record Vol. IX at 40-41 (emphasis added).  Barrientes claims that the emphasized statements constituted an impermissible comment on his failure to testify.  We have included the immediately preceding comments of the prosecutor to place the complained-of comments in perspective.  Barrientes's counsel did not object to the comments, and immediately following these comments, the prosecutor moved on to an unrelated topic.

We must first decide whether this claim was adjudicated on the merits in state court for purposes of § 2254.  Barrientes did not raise this claim in his direct appeal, but he did raise it in every habeas petition he filed.  He also raised it in his brief in support of his application for COA in the district court.  No court has ever addressed the claim specifically.  After Barrientes filed his First Habeas Petition, the state trial court found "that there [were] no controverted previously unresolved facts which are material to the legality of petitioner's confinement," and consequently forwarded the application to the Texas Court of Criminal Appeals.  <u>Ex parte Barrientes</u>, No. 19,007-01 (Tex. Dist. Ct. Aug. 19, 1998) (order on application for writ of habeas corpus).  The Texas Court of Criminal Appeals, after ordering an evidentiary hearing to address Barrientes's claims of ineffective assistance of counsel, concluded that "none of applicant's fourteen allegations have merit.  Accordingly,

84

[the Texas Court of Criminal Appeals decided] that the application should be in all things DENIED." See Ex parte Barrientes, No. 19,007-01, order at 2 (Tex. Ct. Crim. App. Feb. 1, 1989). The district court did not explicitly address this claim in either its 1995 Order or its 1998 Order.

We have established a three-part inquiry to determine whether a claim has been adjudicated on the merits for purposes of § 2254. When the last state adjudication of the claim is silent or ambiguous, "the federal court should 'look through' to the last clear state decision on the matter." Jackson v. Johnson, 194 F.3d 641, 651 (5th Cir. 1999). Where, as is the case here, the claim was not raised on direct appeal, we must determine whether the last state adjudication was on the merits. See id. To do so, "we consider '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits.'" Id. (quoting Green v. Johnson, 116 F.3d 1115, 1121 (5th Cir. 1997)).

We begin with the first prong, which requires us to look at what state courts have done in similar cases. The well-settled rule in Texas appears to be that, "[u]nless the arguments of the prosecutor are so prejudicial that no instruction could cure the harm, the failure to timely object waives any error." McGee v.

85

State, 774 S.W.2d 229, 240 (Tex. Crim. App. 1989) (en banc); see also Harris v. State, 784 S.W.2d 5, 12 (Tex. Crim. App. 1989) (en banc); Van Zandt v. State, 932 S.W.2d 88, 92-93 (Tex. App. 1996). An argument is "so prejudicial that no instruction could cure the harm" if it "is clearly calculated to inflame the minds of the jurors and is of such character as to suggest the impossibility of withdrawing the impression produced." Van Zandt, 932 S.W.2d at 93 n.1. We are unpersuaded that the statements made by the prosecutor in this case fall under this exception, and conclude that in cases similar to this the error complained of is waived for failure to make a contemporaneous objection. Because no objection was made by Barrientes's counsel, and such failure constitutes waiver, our inquiry under the first prong supports concluding that this claim was not adjudicated on the merits.

We now move on to the second prong, "whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits." The state habeas record in this case is limited, but it appears that no brief was filed by the State in response to Barrientes's First State Petition. Moreover, the State's Answer, Motion for Summary Judgment, and Supporting Brief filed in the district court in response to Barrientes's Second Federal Petition attacks this claim on the merits rather than arguing that it was waived for failure to make a contemporaneous objection. We surmise from this history that the Texas Court of Criminal Appeals was not put

86

on notice by the State that this claim was waived.  Our inquiry under this factor weighs in favor of concluding that the claim was adjudicated on the merits.

We now proceed to the final prong of our inquiry, "whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits."  The Texas Court of Criminal Appeals denied Barrientes's First State Petition.  Relying on Ex parte Torres, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (en banc), we have before explained that "[u]nder Texas law a denial of relief by the Court of Criminal Appeals serves as a denial of relief on the merits of the claim." Miller v. Johnson, 200 F.3d 274, 281 (5th Cir. 2000); see also Bledsue v. Johnson, 188 F.3d 250, 257 n.13 (5th Cir 1999); Singleton v. Johnson, 178 F.3d 381, 384 (5th Cir. 1999); Jackson v. Johnson, 150 F.3d 520, 524 (5th Cir. 1998).  Considering our precedent, the denial by the Texas Court of Criminal Appeals does not suggest reliance on procedural grounds.

After considering the results of each of our inquiries, we conclude that this claim was adjudicated on the merits by the Texas Court of Criminal Appeals.  See Miller, 200 F.3d at 281 (relying in part on Torres to determine that an adjudication was on the merits).  But see Jackson, 194 F.3d at 651 (concluding that an adjudication was not on the merits without considering

87

<u>Torres</u>).[30]  Having determined that the issue was adjudicated on the merits in the state courts, we owe deference to their disposition of the claim under § 2254.

We now proceed to determine whether Barrientes has made a substantial showing of the denial of a constitutional right.  The comment made by the prosecutor must be considered in the context of his entire argument.

> For there to have been a denial of one's fifth amendment right to remain silent, the prosecutor's manifest intent in making the remark must have been to comment on the defendant's silence, or the character of the remark must have been such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.  To expound on the first inquiry, the prosecutor's intent is not manifestly impermissible if there is some other, equally plausible explanation for the remark.  For the second inquiry, the question is not whether the jury might or probably would view the challenged remark in this manner, but whether it necessarily would have done so.

<u>Id.</u> (footnote omitted).  Of course, if either the "manifest intent" or "natural and necessary construction" prong is met, we must further consider whether the error was harmless under the standard of <u>Brecht</u>, 507 U.S. at 638.  <u>See</u> <u>Lucas v. Johnson</u>, 132 F.3d 1069, 1079 (5th Cir. 1998).  In <u>Jackson</u>, we addressed the

---

[30] The determination in <u>Jackson v. Johnson</u>, 194 F.3d 641 (5th Cir. 1999), that adjudication was not on the merits arguably conflicts with cases cited in the text that analyze the question of adjudication on the merits with an eye towards the <u>Torres</u> decision.  Some of these cases predate <u>Jackson</u>, and, under our jurisprudence, if two panel decisions conflict, the earlier one controls.  <u>Texaco, Inc. v. Louisiana Land and Exploration Co.</u>, 995 F.2d 43, 44 (5th Cir. 1993).  One panel of this court may not overrule another panel.  <u>See</u> <u>Broussard v. Southern Pac. Transp. Co.</u>, 665 F.2d 1387, 1389 (5th Cir. 1982) (en banc).

following comment: "Look at him; he hasn't shown any remorse. After he and Clary killed this girl, they went into the beer joint and drank beer and shot pool."  194 F.3d at 652.  We concluded that this comment did not constitute an impermissible comment on the defendant's right to remain silent because it met neither prong of the disjunctive inquiry.  See id. at 652-53. Likewise, in Lucas, we concluded that the following comment was "neither a direct nor an indirect comment on [the defendant's] failure to testify:"

> The handwriting comparison on the matches with Henry Lee Lucas was inconclusive.  We don't know that those are his matches;  they might have been the girl's matches.  She might have written in the matchbook;  we don't know that. Only one person does know that, and that's Henry Lee Lucas.

132 F.3d at 1079 & n.6.  There, we looked at "the overall point of the prosecutor's statements."  In Madden v. Collins, 18 F.3d 304 (5th Cir. 1994), however, we examined the following statement made by the prosecutor during the closing of the guilt/innocence phase of Madden's trial and concluded that it constituted an impermissible comment on his failure to testify:

> Then, also, the defense will argue that why in the world would someone who killed, murdered two people and stole this credit card sign their own name to the Texaco card?  I don't know that;  you don't know why.  There's only one person here that knows why, and there's only one person here that knows the answer to all of these questions.

Id. at 309.  Ultimately, we concluded that the error was harmless.  See id.

It is against this backdrop that we examine the comment made here. Barrientes argues that the prosecutor impermissibly commented on his failure to testify at the penalty phase of his trial by stating, "He knows. He knows where the witness is as he sits there right now. He knows. He knows." State Record Vol. IX at 41. Our task is to determine whether "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack, 120 S. Ct. at 1604 (internal quotation marks omitted). The district court denied the petition with respect to this claim, and because we treat the disposition of this claim by the Texas Court of Criminal Appeals as a disposition on the merits, the district court was bound to deny the claim, as it did, unless the state court disposition was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

While we agree that reasonable jurists could debate whether a constitutional violation occurred, we conclude that reasonable jurists could not debate whether the state court disposition was contrary to or involved an unreasonable application of "governing legal principles from [the Supreme Court's] decisions." Williams, 120 S. Ct. at 1523. Consequently, reasonable jurists

90

could not "debate whether . . . the petition should have been resolved in a different manner."[31]  <u>Slack</u>, 120 S. Ct. at 1604.


## C.  Admission of Evidence of Unadjudicated Crimes

The next claim for which Barrientes seeks a COA is that the failure of the state court to instruct the jury on the proper use that could be made of evidence of unadjudicated crimes constituted a violation of his rights under the Eighth Amendment. He asserts that due process requires particularized instructions if evidence of unadjudicated crimes is admitted in the penalty phase of a capital murder trial.  Barrientes argues that the jury be instructed, perhaps at a minimum, on the burden of proof to apply in reviewing evidence of unadjudicated crimes and the use that can be made of the evidence.  He cites only one case, <u>Williams v. Lynaugh</u>, 814 F.2d 205 (5th Cir. 1987), for the proposition that "'properly applied standards of relevance and

---

[31] Even were we to grant Barrientes a COA on this claim, it would fail on the merits.  It was not the prosecutor's "manifest intent" in making the remark to comment on Barrientes's silence, nor was the remark of such a character that "the jury would naturally and necessarily construe it as a comment on [Barrientes's] silence."  Viewed in the context of the prosecutor's entire argument, the remark is most naturally taken as an implication that Barrientes killed the missing witness. Indeed, it is this inference that Barrientes used in support of the argument that convinced the district court to vacate his sentence of death.  We recognize that the statement could be taken as a comment on his failure to testify at the penalty phase, and it is even possible that the prosecutor intended, in part, to comment on his failure to testify.  Under our jurisprudence, however, that is not enough.

sufficiency of proof' are necessary to ensure that constitutional safeguards are observed when allegations of unadjudicated offenses are presented by the State at sentencing." Barrientes's COA Brief at 51 (quoting Williams, 814 F.2d at 208).

The State responds that this is one of the claims on which the district court granted relief. We disagree. The claim to which the State refers was that, prior to evidence of unadjudicated crimes being admissible, the State must make a preliminary showing to the trial court that a reasonable jury could find, by a preponderance of the evidence, that the defendant committed the crime. Nonetheless, Barrientes has failed to make a substantial showing of the denial of a constitutional right.

In United States v. Hall, 152 F.3d 381 (5th Cir. 1998), abrogated on other grounds, United States v. Martinez-Salazar, 120 S. Ct. 774 (2000), we addressed a similar claim. We stated:

> As we understand it, Hall's argument appears to be that, when the government offers evidence of an unadjudicated offense in support of an aggravating factor, the jury must be instructed that it cannot consider this evidence in determining whether the government has carried its burden of proving the aggravating factor beyond a reasonable doubt unless it has first determined that the evidence establishes by some quantum of evidence that the unadjudicated offense occurred. Hall has offered no legal support for this proposition, and the only precedent that we have found militates against it.

Id. at 404 (footnote omitted). Barrientes fares no better with his reliance upon Williams. The claim at issue in Williams was the very different proposition that the very introduction of

92

evidence of unadjudicated offenses violates constitutional guarantees.  See 814 F.2d at 207-08.  In any event, even were we inclined to recognize that the constitutional right for which Barrientes argues, his claim would nonetheless be Teague-barred. See White v. Johnson, 79 F.3d 432, 437 (5th Cir. 1996) (refusing to address a claim in an application for a CPC because the claim was Teague-barred).

### D.  Jury Consideration of Evidence Outside the Record

A diagram of the Fina-Jamco store provided by the prosecution was not drawn to scale.  Based on how the drawing was rendered, Barrientes claims that jurors questioned whether Sanchez could have seen Barrientes pushing someone into the cooler from his vantage point at the front door.  Barrientes avers that one juror claimed experience in constructing convenience stores and explained to his fellow jurors what the proper scale should be and that Sanchez could see Barrientes from his vantage point.

Neither in state court nor in the district court has Barrientes produced evidentiary support for this claim.  He fails to make a substantial showing of the denial of a constitutional right.

### V.  Conclusion

93

For the foregoing reasons we REVERSE the district court's order with respect to the Preliminary Showing Claim, VACATE the district court's order insofar as it granted habeas relief on five other claims, and REMAND the case for further proceeding consistent with this opinion. The district court's judgment disposing of this application for habeas relief should be entered within 150 days of the issuance of our mandate. We DENY Barrientes's application for a certificate of appealability.